## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

Case No.: 25-4568

| | |
|---|---|
| M7 Indústria e Comércio de Compensados e Laminados Ltda., Industrial Arbhores Compensados EIRELI, and Instituto Brasileiro de Certificações e Inspeções, Ltda. | ) ) ) ) ) |
| *Plaintiffs* | ) ) |
| v. | ) ) |
| U.S. STRUCTURAL PLYWOOD INTEGRITY COALITION, an unincorporated association, SCOTCH PLYWOOD CO., INC., an Alabama corporation, VENEER PRODUCTS ACQUISITIONS, LLC, a Delaware limited liability company d/b/a SOUTHERN VENEER PRODUCTS, SOUTHERN VENEER SPECIALTY PRODUCTS, LLC, a Georgia limited liability company, HUNT FOREST PRODUCTS LLC, a Louisiana limited liability company, FRERES LUMBER CO., INC., an Oregon corporation, MURPHY COMPANY, an Oregon corporation, SDS LUMBER LLC, a Washington limited liability company, and SWANSON GROUP, INC., an Oregon corporation, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| *Defendants.* | ) ) ) ) ) |

## COMPLAINT

## COMPLAINT

M7 Indústria e Comércio de Compensados e Laminados Ltda. ("M7"), Industrial Arbhores Compensados EIRELI ("Arbhores") and Instituto Brasileiro de Certificações e Inspeções ("I.B.C.I") (collectively, M7, Arbhores, and I.B.C.I. are the "Plaintiffs") by and through their undersigned attorneys, as and for a Complaint against the U.S. Structural Plywood Integrity Coalition—comprising Scotch Plywood Co., Inc., Veneer Products Acquisitions, LLC d/b/a Southern Veneer Products, Southern Veneer Specialty Products, LLC, Hunt Forest Products, LLC, Hunt Forest Products LLC, Freres Lumber Co., Inc., Murphy Company, SDS Lumber LLC, and Swanson Group, Inc. (each a "Defendant" and, collectively, the "Coalition" or the "Defendants")—hereby alleges as follows:

## NATURE OF THE CASE

1.    This Complaint seeks redress for unlawful conduct orchestrated by a self-described "Coalition" of U.S. plywood manufacturers who conspired to suppress competition through coordinated false advertising. Defendants fabricated test outcomes and spread false safety claims about Brazilian plywood – not to influence policy or regulation, but to eliminate competition. This was a progressively escalating campaign involving false and misleading submissions to courts and regulators, with the goal of upending the infrastructure for the importation of plywood from Brazil.

2.    The backdrop of this dispute lies in an innocuous commodity: structural plywood. Plywood is a simple product, and it is used virtually everywhere in the U.S. construction industry.

3.    Structural plywood must comply with the PS1 Voluntary Product Standard (the "PS1 Standard"), developed and overseen by the U.S. Department of Commerce and the National Institute of Science and Technology. The PS1 Standard sets the parameters for the manufacture, sizing, grading, and inspection of structural plywood. Among PS1's requirements is that a PS1-

producing mill be <u>certified</u> by a qualified inspection and certification body, and that the certifier in turn be <u>accredited</u> by a qualified accreditation body.

4.    Although nominal competitors, Defendants have formed and operated for years as the "*U.S. Structural Plywood Integrity Coalition,*" an unincorporated trade association functioning as a cartel engaged in a horizontal agreement to restrain trade in violation of the Sherman Act, a collaboration designed to exclude Brazilian plywood – particularly from M7, Arbhores, and other Brazilian plywood mills – from the U.S. market.

5.    Defendants accomplished their scheme by self-deputizing as the enforcement wing of PS1, a voluntary product standard with no regulatory enforcement mechanism, and weaponizing their unfounded and self-serving interpretation of PS1 as a private enforcement tool. While purporting to align their interests to "protect" the PS1 Standard, they overlook documented PS1 shortcomings within their own ranks, confirming that their motive is not to protect the PS1 Standard at all, but to eliminate a common source of competition.

6.    Their efforts have been hugely successful. In 2021, Brazilian mills supplied up to 15% of the $18 billion U.S. structural plywood market. Due solely to the Coalition's anti-competitive actions, that market share fell catastrophically. Plaintiffs M7 and Arbhores, among others, have been effectively blocked from the U.S. market.

7.    Defendants began their campaign by commissioning two rounds of highly flawed and unscientific testing, and using pre-ordained results to spread false product advisories industry insiders and experts rejected. With those efforts failing, the Coalition then commenced a sham false advertising lawsuit, not against Brazilian plywood producers like M7 and Arbhores (the Defendants' competitors), but against U.S.-based certifiers and accreditors of Brazilian plywood,

aiming to intimidate and force those certifiers to exit the market by manufacturing demonstrably false "public safety" concerns that even the Coalition's pretextual testing failed to substantiate.

8.     M7 and Arbhores's former certifier bowed under that pressure, ultimately withdrawing from Brazil and directly compromising M7 and Arbhores's ability to sell their PS1 products in the U.S. This result was the Coalition's stated objective. During discovery in the first lawsuit, Defendant Freres was asked whether the Coalition started that lawsuit to eliminate certification bodies from the Brazilian market. Its answer? "Absolutely."

9.     But as new certifiers attempted to fill the void, the Defendants intensified their extra-judicial efforts beginning in May 2022, forming the basis for this action.

10.     Specifically, M7 and Arbhores's former certifier exited the market pursuant to a consent injunction that established parameters for its potential future re-entry. Importantly, no findings of fact or law were (or ever have been) made that questioned the quality of Brazilian plywood, including products made by M7 and Arbhores.

11.     The Coalition nonetheless circulated the consent injunction nationwide, but falsely claiming to building inspectors, contractors, industry trade periodicals, as well as distributors and wholesalers of plywood – M7 and Arbhores's clients – that a U.S. District Court had determined M7 and Arbhores's plywood to be "off grade" due to its Brazilian origin.

12.     Within weeks of the conclusion of the initial litigation, the Coalition coordinated a successive lawsuit targeting the entity attempting to enter the Brazilian PS1 certification market, remarkably purporting to question its certification capability without (i) testing any of its certified products and (ii) lacking any knowledge of its quality assurance and quality control regimen.

13.     These actions – a coordinated market-based misinformation campaign coupled with successive sham litigations – individually and collectively constitute a horizontal conspiracy in

violation of the Sherman Act and a false advertising campaign in violation of the Lanham Act. They inflicted severe and ongoing harm to the Plaintiffs' reputations and business operations, limiting their access to the U.S. market and affecting U.S. consumers, particularly in the State of New York.

14.    M7 and Arbhores are companies with state-of-the-art facilities. Their products are subjected to testing and inspection protocols that meet not only the PS1 Standard, but also the equivalent standards required by the European Union (CE 2+), which mirrors similar certification schemes for the United Kingdom (British Standard 5268-2 and UKCA), as well as Australia and New Zealand (AS/NZS 2269).

15.    No valid testing by the Coalition or anyone else suggests that either M7 or Arbhores's products fail to meet the PS1 Standard. Both companies maintain unblemished compliance records meeting or exceeding all U.S. and international standards.

16.    Yet due solely to the Defendants' conduct, no U.S. certifier is currently willing to certify M7 or Arbhores under PS1, depriving them of a lawful path to compete in the U.S. market.

17.    After two years without certification (or any legitimate path to obtaining it) M7 is now currently certified to PS1 by Plaintiff I.B.C.I., a Brazil-based certification body, which joins this suit seeking declaratory relief that its PS1 accreditation meets all the requirements set forth by the U.S. Department of Commerce in the latest iteration of PS1, PS 1-22.

18.    Defendants, individually and collectively, have made material misrepresentations of fact regarding the quality of Brazilian PS1 plywood and have engaged in a concerted scheme to restrain trade. These acts violate the Lanham Act (15 U.S.C. § 1125) and the Sherman Act (15 U.S.C. § 1).

## THE PARTIES

19.     Plaintiff M7 Indústria e Comércio de Compensados e Laminados Ltda. is a Brazilian corporation that operates a plywood mill in Lages, Santa Catarina, Brazil. M7 is certified to produce PS1-compliant structural plywood. It is also certified to the European Union standard CE 2+, is actively accredited by the Forest Stewardship Council®, and was initially certified to PS 1 in 2020. After M7's most recent certifier, PFS Corp., exited the Brazilian market due to the Coalition's coordinated pressure campaign, M7's PS1 plywood production was temporarily halted altogether, and has only resumed on a limited basis following certification through I.B.C.I.

20.     Plaintiff Industrial Arbhores Compensados EIRELI is a Brazilian limited liability entity (an EIRELI, or *empresa individual de responsibilidade limitida* in Portuguese) is a producer of plywood and engineered wood products, and is headquartered in Palmas, a municipality in the Paraná department of southern Brazil. The U.S. market for its products collapsed after the Coalition succeeded in forcing PFS Corp., Arhores's former certifier from Brazil. Arbhores's current products are certified under EPA TSCA Title VI for ultra-low emitting formaldehyde resins, and CARB ATCM 93120.3(d) for its hardwood plywood.

21.     Plaintiff Instituto Brasileiro de Certificações e Inspeções is a third-party certification agency duly accredited to provide certifications under ISO/IEC Standard 17065 and currently certifies M7 and ten other Brazilian mills to PS 1-22. It PS1 quality management system is accredited by Brazil's national metrology authority, the Instituto Nacional de Metrologia, Qualidade e Tecnologia or INMETRO, a federal agency operating under the Ministry of Economy, Brazil's equivalent to the U.S. Department of Commerce. I.B.C.I. operates under Accreditation number OCP 0180, effective as of January 2, 2024. It is based out of Curitiba, in the Paraná department of Brazil.

22.     Defendant U.S. Structural Plywood Integrity Coalition is an unincorporated association of the nine U.S.-based plywood producers who have combined efforts to illegally and improperly stifle competition in the domestic softwood structural plywood market, which is comprised of the following members:

23.     Defendant Scotch Plywood Co., Inc. is an Alabama corporation which owns and operates three plywood mills in Beatrice and Fulton, Alabama, and in Waynesboro, Mississippi.

24.     Defendant Veneer Products Acquisitions, LLC d/b/a Southern Veneer Products, is a Delaware limited liability company that owns and operates a plywood plant in Fitzgerald, Georgia.

25.     Defendant Southern Veneer Specialty Products, LLC is a Georgia limited liability company that owns and operates a plywood mill in Moncure, North Carolina.

26.     Defendant Hunt Forest Products, LLC is a Louisiana corporation that owns and operates a plywood plant in Pollock, Louisiana, with a principal place of business located in Ruston, Louisiana.

27.     Defendant Freres Lumber Co., Inc. is an Oregon corporation that owns and operates two veneer plants and a plywood mill, with a principal place of business located in Lyons, Oregon.

28.     Defendant Murphy Company is an Oregon corporation that owns and operates a plywood plant and three veneer plants, with a principal place of business located in Sutherin, Oregon.

29.     Defendant SDS Lumber, LLC is a Washington limited liability company that owns and operates a plywood plant in Bingen, Washington.

30.     Defendant Swanson Group, Inc. is an Oregon corporation that owns and operates plywood plants in Glendale and Springfield, Oregon, with a principal place of business located in Roseburg, Oregon.

## JURISDICTION AND VENUE

31.     This Complaint is brought under: (i) the Lanham Act, 15 U.S.C. § 1125; and (ii) Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover damages and obtain injunctive relief caused by past and continuing violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

32.     This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331 and 1337. This Court also has supplemental jurisdiction over Plaintiffs' related state law claims under 28 U.S.C. § 1367, because those causes of action are so related to the federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

33.     This Court has personal jurisdiction over each of the Coalition member Defendants because each is engaged in substantial and continuous business activities in the State of New York, has purposefully directed tortious conduct and false statements at consumers and commercial actors within the State, and has caused injury within this District through conduct expressly aimed at this venue.

34.     Venue is proper in this District under 28 U.S.C. § 1391 because (i) Defendants are subject to personal jurisdiction in this District; (ii) a substantial share of the events giving rise to the claims occurred in this District; (iii) a substantial amount of the Defendants' unlawful conduct is felt in this District; and (iv) Defendants engage in business in this District and have benefitted from the artificial reduction in competition within the structural plywood market here.

## FACTUAL ALLEGATIONS

**I.     Overview of the PS1 Accreditation and Certification System**

35.     PS1 is a Voluntary Product Standard overseen and implemented by the U.S. Department of Commerce (the "Department") through the National Institute of Science and Technology ("N.I.S.T.").

36.     As a _Voluntary_ Product Standard, PS1 is subject to regulatory enforcement of neither the Department nor N.I.S.T.. Instead, the Department delegated its interpretation and application of PS1 to the PS1 Standing Committee, a body comprised of industry professionals and technical experts with experience in plywood manufacturing, inspection, and use.

37.     The current version of PS1, PS 1-22, prescribes the technical specifications for structural plywood, including standards for wood species, veneer grading, adhesive bond quality, panel construction and workmanship, dimensional tolerances, labeling, moisture content, and packaging for plywood intended for structural and industrial applications.

38.     To qualify as a PS1-compliant manufacturer, a plywood mill must obtain certification by a body accredited under internationally accepted conformity assessment frameworks developed by the International Organization for Standardization ("ISO") and the International Electrotechnical Commission ("IEC"). These frameworks are:

   a.   ISO/IEC 17020 (for inspection bodies);

   b.   ISO/IEC 17025 (for testing laboratories); and

   c.   ISO/IEC 17065 (for product certification bodies).

39.     A certification body may either:

   a.   be directly accredited to ISO/IEC 17020 and 17025; or

   b.   be accredited to ISO/IEC 17020 and ISO/IEC 17065, while subcontracting with an independent ISO/IEC 17025-accredited laboratory for product testing.

40.    Certification bodies themselves must be accredited by a recognized accreditation body operating under ISO/IEC 17011, the international standard governing the accreditation of conformity assessment bodies.

41.    The PS1 certification framework is structured to ensure that certified mills are subject to both ongoing physical inspections and periodic laboratory testing, under one of the following models:



42.    All Defendants are currently certified to PS1 by a single entity: APA – The Engineered Wood Association ("APA").

43.    Prior to the Coalition's interference campaign, Brazilian plywood producers – including M7 and Arbhores – were certified to PS1 by either Timber Products Inspection, Inc. ("TPI") or PFS Corp. ("PFS-TECO"), both of which were accredited by the International Accreditation Service ("IAS") to conduct PS1 inspection and testing services.

44.     At the time of the events preceding this action, TPI and PFS-TECO were the only certification bodies with significant PS1 certification operations in Brazil, and IAS was one of the few accreditation bodies worldwide providing accreditation for PS1 certifiers.

## II.    The Voluntary Product Standard PS 1

### A.    PS 1 Is a Self-Enforcing Product Standard Designed to Promote Marketplace Quality Control

45.     PS1 establishes the technical framework for certifying structural plywood, including the obligations of testing, inspection, and certification bodies. Once certification has been granted initially – a process called "qualification" – certification bodies are responsible for periodically evaluating whether a mill's ongoing production continues to meet PS1's standards.

46.     Since PS1 is a voluntary, self-regulating standard, disputes over product quality, while rare, are addressed via the re-inspection and cost-shifting mechanism set forth in PS1's Appendix B.

47.     Plywood is not a uniform commodity. Because of natural product variability, quality control is managed at a mill through internal quality assurance and quality control protocols overseen by trained personnel. A panel will nonetheless occasionally be produced in an "off grade" manner, meaning it fails to meet criteria and measurements depicted on a PS1 stamp.

48.     "Off-grade" defects come in many forms, almost all of which are visible to the trained eye. An over-thick or under-thin panel, or one with delamination (*i.e.*, separation of the plies) will be identified by mill personnel, separated from a production run, and placed to the side.

49.     Even still, it is accepted within the industry that an "off-grade" panel may elude detection at the mill and end up in the supply chain, notwithstanding a mill's QA/QC efforts.

11

50.     Plywood is sold in bundles. So a bundle containing an "off-grade" panel might be distributed without detection by wholesalers, retailers, or even a contractor at the point of delivery.

51.     The end purchaser of plywood panels – generally contractors – are usually best-positioned to identify non-compliant products because they are most familiar with how plywood behaves in real-world application. Since contractors are incentivized to identify nonconformities and plywood mills understand their "off-grade" products cannot be implemented, resolving issues of "off-grade" panels is generally straightforward, and invoking dispute resolution is rare.

52.     When a dispute does arise, its resolution is covered by PS1's Appendix B:

   a. A purchaser notifies the seller of an alleged nonconformity;

   b. If no agreement is reached, a re-inspection may be requested from the certifier identified on the PS1 stamp;

   c. The purchaser must preserve the plywood in undamaged condition up to 30 days;

   d. The seller must acknowledge receipt of the re-inspection request;

   e. The certifier performs the re-inspection per PS1 protocols;

   f. If the plywood fails, the seller bears the costs. If it passes, the buyer does.

53.     This cost-shifting mechanism ensures that marketplace actors, not regulators (and certainly not competitors), resolve disputes, with certifiers serving as neutral arbiters if needed.

54.     But even if a defective panel evades contractor detection, a final safeguard exists: the local building inspector. Inspectors are trained to identify off-grade or nonconforming materials and serve as the final checkpoint before installation in the as-built environment.

55.     This multi-layered system of quality control, involving mill personnel, certifiers, buyers, and inspectors, has historically ensured the safety and reliability of all PS1-certified plywood used in the U.S.

### III.    The Beginnings of the Coalition

#### a.    The Influx of Brazilian Plywood

56.    Starting in about 2015, Defendant Freres was encountering business headwinds. Over the previous years the market share of domestic plywood steadily decreased due to expanding availability of a more affordable product of comparable or superior quality: Brazilian plywood.

57.    Plywood is treated as a commodity, with prices determined primarily through negotiated private contracts between producers (mills) and wholesalers or distributors. These prices are influenced by various factors, including raw material costs, construction activity, and transportation expenses. Market prices are then reported in weekly or monthly intervals in industry publications such as *Random Lengths*. A bundle of Brazilian plywood therefore will not typically appear alongside a bundle of the same domestic product at an 84 Lumber or Lowe's store with a drastically lower price. Rather, all mills – domestic and international – compete to secure contracts with wholesalers and distributors and adjust their prices accordingly through designated sales teams. For Freres, it found that the existence of Brazilian plywood in the domestic market undercut its sales team's negotiating leverage, and the company began searching for relief.

58.    Its concern was shared by Defendant Southern Veneer and its affiliate, Defendant Southern Veneer Specialty (collectively, "Southern"). Beginning in 2016, its market share in South Florida decreased significantly, which Southern attributed to the increased importation of Brazilian plywood as well.

59.    Representatives from Freres and Southern met at a conference to discuss these concerns, and Southern agreed to consult an attorney to "see what they could do about it." But when it did, it was advised that the appropriate way of approaching the issue was through the PS1

Standing Committee, or through the Department of Commerce. Neither offered an avenue for Freres and Southern to reach their goal.

60.     Unbeknownst to both defendants, Defendant Scotch also had concerns about Brazilian plywood. It previously petitioned its U.S. Senator to impose an 8% tariff on the importation of Brazilian plywood, hoping that such tariffs would help stem the tide of Brazilian plywood. But they did not. By 2017, even with the imposition of tariffs, Brazilian plywood importation grew to nearly 15% of the domestic market supply of plywood.

61.     Defendants Freres, Southern, and Scotch eventually concluded that the only way to prevent Brazilian plywood from entering the country was to prevent its certification. And the only way to prevent its certification was to manufacture evidence that Brazilian plywood could not—because of its origin, or its methods of manufacture—satisfy the PS1 Standard.

62.     Even then, the "evidence" the Coalition had to manufacture by necessity had to be invisible even to the trained eye. After all, Brazilian plywood had been used in the U.S. market without any issue for nearly thirty years, and the PS1 system facilitated a seamless process whereby plywood is produced, distributed, sold, and implemented in construction, with marketplace checks at each step along the way.

63.     For the Coalition to do maximum damage, it had to manufacture a claim akin to the "Chinese drywall" scandal, an environmental health catastrophe that affected the U.S. – particularly the State of Florida – between 2001 and 2009, when noxious chemicals were found in seemingly innocuous drywall panels that were installed in residential construction. And that is exactly the archetype the Coalition attempted to create.

**b. The Brazilian Plywood Industry and The Coalition's Willful Misconceptions About It**

64.    Brazilian plywood mills generally use the timber resource of loblolly or slash pine, and both loblolly and slash pine are non-native to Brazil. Those trees are grown in managed farms in southern Brazil, and specifically in the Santa Catarina and Paraná departments.

65.    Santa Catarina and Paraná are coastal departments in Southern Brazil hundreds of miles from the Amazon rainforest. Pine silviculture began in that region began through government initiatives in the 1960's and 1970's, with many responsible companies – M7 and Arbhores among them – ultimately engaging in sustainable forest management to promote the growth, harvesting, and production of plywood consistent with internationally-recognized environmental, social, and economic standards.

66.    Southern Brazil is not the only South American region to produce plywood. Neighboring regions in Argentina and Uruguay that share Southern Brazil's climate are also plywood manufacturers and each use non-native pine species to do so. The climate in the region is humid sub-tropical, similar to the climate of the Florida panhandle, Louisiana, Georgia, and North Carolina, where many of Defendants' mills are located.

67.    Defendants, however, claimed without evidence that Brazilian plywood is produced in the Amazon rainforest, a tropical zone.  It is not.

68.    Juan Medellin, the sales manager for Southern, testified under oath as follows:

Q:    Okay. So you're saying that the Brazilian mills the raw materials cannot consistently produce PS 1-09 compliant plywood; is that right?

A:    Correct.

Q:    Okay. What evidence do you have that slash and loblolly pine grows faster in Brazil?

A:    Obviously I have never been to Brazil, but the plantations that they put in there pretty much in the rainforest it tells me those species grow too fast in weather conditions.

. . .

Q:    Okay. So how do you know that slash pine and loblolly pine actually grows faster in Brazil?

A:    Again by the growing conditions in Brazil, which is wetter than it is in United States.

Q:    And is that something that you were told?

A:    That's something that I know for a long time.

Q:    How do you know that?

A:    The rainforest.

69.    Despite the absence of any basis in fact or science for this position, Defendant Freres reinforced these unfounded assumptions on its company blog, writing:

> Over the past several years, our domestic markets have been flooded with structural wood products originating from the **Amazon rainforest**. Decades ago, native forests in the Amazon were cleared and large tracts of Loblolly pine, Slash pine, and other North American species were planted, primarily for pulp production. These tree species produce a strong product in North American climate but when grown outside their native environments, they do not produce the same quality or performance of fiber. The wood fiber gains very little stiffness or strength during its maturation in Brazil's temperate climate and full-year growing season, leading to a compromised construction material.

(emphasis added).

70.    This easily disproven "theory" that Brazilian PS1 plywood originates from the Amazon rainforest was a pretextual basis to claim product deficiencies, but Freres and Southern needed some sort of "proof." They therefore began collaborating with Defendant Scotch, which held an important seat on APA's industrial sub-committee. Together they developed a plan to widely disseminate false information about Brazilian plywood.

16

71.      These nascent Coalition members – Freres, Southern (including Specialty Veneer), and Scotch –  found a willing participant in their PS1 certification body, APA, which then listed its mission statement as protecting the interests and growth of U.S. mills: "APA's vision is to maintain our position as the leader in creating engineered wood product growth for North American member companies" (emphasis added).

72.      Unlike neutral certification bodies like I.B.C.I., TPI, PFS-TECO, and others, APA is structured to profit from the success of its own members. It only offers certification to mills that join its organization, and charges dues based on output, not services rendered. In this way, APA stood to gain directly from the elimination of Brazilian competitors, a clear cut violation of ISO/IEC 17065, which contains strict impartiality requirements ("It is necessary for certification bodies and their personnel to be impartial, and to be perceived as impartial, in order to give confidence in their activities and their outcomes").

## IV.    APA Commissions Pretextual and Unscientific "Testing"

73.      There have been no known or documented instances of Brazilian plywood "failure" in the U.S. or elsewhere.

74.      But for the Coalition to achieve its aims, it was necessary to create the impression that latent defects exist in Brazilian plywood. The Coalition therefore needed to create an "invisible" issue like the Chinese drywall scandal, one that could only be identified through testing generally unavailable to contractors or building inspectors.

75.      APA's own testing overseer, Dr. Borjen Yeh, confirmed that the initiative to test Brazilian plywood originated not from a market concern articulated by builders or building inspectors, but from APA's marketing committee:

> Q:     So the marketing committee for the members' products identifies the concept of testing South American plywood; correct?

17

A:      Correct.

Q:      Okay. Were you aware of that, that fact before I showed you this document?

A:      Yes.

Q:      Okay. So it's true that the APA members of the marketing committee that markets and advertises the APA members' products came up with the idea of testing the Brazilian plywood; correct?

A:      Correct.

76.     Not surprisingly given its origins, APA's testing was illegitimate, unscientific, and biased.

77.     First, the Brazilian plywood panels to be tested were hand-picked by Coalition members themselves, a classic example of sampling bias.

78.     Defects in plywood are readily observable, and industry insiders are adept at identifying and recognizing innate variability in product quality due to the placement of knots and other factors. For Coalition members, plywood industry experts, to hand pick competitor panels to be tested raises an obvious and disqualifying conflict of interest.

79.     The number of panels tested only delegitimized the process further.

80.     A plywood panel is generally 8 x 4, meaning it is 32 square feet.

81.     In 2017, the year APA commissioned its "testing," 721 million square feet of plywood were imported into the U.S. from Brazil.  Yet the Coalition tested just 65 self-selected panels, representing 2,080 total square feet of plywood, or **.00029%** of the total amount of plywood imported into the U.S. from Brazil in one year.

82.     None of the panels the Coalition tested were produced by M7 or Arbhores.

83.     The testing was also performed in suspicious increments:

• 5 panels of 23/32 plywood were from Tableros;

18

- 25 panels of 23/32 plywood were from Lavrasul;

- 5 additional panels of 23/32 plywood were from Lavrasul;

- 5 panels of ¾ plywood were from Rochembach;

- 5 panels of 23/32 plywood were from Sudati – Ibaiti;

- 5 additional panels of 23/32 plywood were from Guararapes – Palmas;

- 6 panels of 23/32 plywood were from FComp;

- 4 panels of 23/32 plywood were from Miraluz; and

- 5 panels of 23/32 plywood were from Sudati – Ibaiti.

84.     So of the 65 samples the Coalition selected to be sent to APA for testing, 30 – nearly half – came from a single mill, Lavrasul.[1]

85.     The APA tested two attributes: bending <u>strength</u> (how much force a panel can bear before breaking) and bending <u>stiffness</u> (how much it flexes under normal use). The tested panels uniformly passed the <u>strength</u> test, but uniformly failed the <u>stiffness</u> test. This outcome is highly irregular for a product like plywood, where strength and stiffness are usually correlated, even if it is not exact. The outcome – a unanimous passing rate on one characteristic with a corresponding unanimous failing rate on a correlated statistic – strongly suggests an illegitimate testing environment or manipulated test results.

86.     But even if the results were legitimate, the fact that the panels passed all strength requirements suggests potential comfort issues, not a safety risk.

---

[1] To be clear, Lavrasul is a well-respected Brazilian plywood mill with no known quality issues. While the Brazilian plywood manufacturing community, like any industry, is not monolithic and some manufacturers have better reputations than others, there is no reason to question the integrity or quality of Lavrasul's products. This Complaint should not be read to suggest otherwise. The alleged defects lie entirely in APA's testing methodology and sampling process, not in the products of Lavrasul or any other mill.

87.     Dr. Weichiang Pang, who oversaw further testing at Clemson University (to be described below), testified:

Q:      Would you agree with me that serviceability – sorry. Stiffness is a serviceability issue where strength is a life safety issue?

A:      That is a fair assessment, yes.

88.     Former APA quality director Steve Zylkowski explained::

Stiffness really gets more to serviceability . . . I can't - -frankly, I can't think of any large negative critical failure mode that can result from low stiffness, unless it was extremely, extremely low.

89.     The APA testing was plagued with fundamental defects: (i) the panels were self-selected, showing sample bias; (ii) the study disregarded the anomalous stiffness and strength outcomes, a result that undermines the integrity of the testing environment; (iii) the sample size was miniscule, representing just .00029% of the total imported volume of Brazilian plywood; and (iv) the mills that were tested comprised just a small subset of Brazilian plywood producers, as evidenced by the fact that neither M7 nor Arbhores's panels were tested.

90.     APA nevertheless issued a product advisory in 2018 purporting to call into question the quality of all Brazilian plywood, consistent with its extant mission statement to protect the business interests of its North American members.

**V.      APA Purports to Impugn All Brazilian Mills With its Testing Outcome**

91.     The Coalition started with a market problem: their U.S.-based plywood products were losing ground to comparable or superior Brazilian imports. They attempted to engineer a basis to undercut that market, but they needed a pretext: a fabricated narrative that Brazilian plywood was inherently substandard.  APA provided the "evidence" for this false narrative by commissioning testing that was scientifically flawed and heavily biased, largely implicating just one Brazilian mill under highly suspicious circumstances.

20

92.     But because the purpose of APA's testing was to begin the process of affecting importation of Brazilian plywood generally (not just from one mill or a handful of mills), in June 2018 APA issued a "Product Advisory," not addressed at the six mills whose products it tested, but referring to all Brazilian plywood producers generally, improperly casting a wide net over entities like M7 and Arbhores whose products were not implicated at all.

93.     The purpose of APA's Product Advisory was to provide cover for the early Coalition members to broadcast claims at a *region*, not just a handful of mills.

94.     Defendant Scotch's immediate response is indicative of this effort. It issued a press release, titled "ALL PLYWOOD IS NOT THE SAME. TRADE ASSOCIATION ISSUES WARNING REGARDING BRAZILIAN PLYWOOD."

95.     It reads:

The United States is being flooded with massive quantities of Brazilian plywood that do not meet U.S. Voluntary Product Standard PS-1 for structural plywood as claimed. The imported product fails to meet stiffness standards and span rating requirements. Importers have not only falsely claimed compliance – some will even be so bold as to stamp "Made in America" on the boards, meaning South America but leaving out that one vital descriptor to deceive purchasers.

96.     Those claims were, and are, false.

## VI.    The Unscientific and Biased Clemson University Testing

97.     They also did not resonate within the plywood market.

98.     Freres reported that the APA Product Advisory "really didn't end up with too much of an effect on the overall marketplace as far as warning people about the potential use of the material."

99.     Part of the reason is because its target audience understood it for what it was: an attempt by competitors to improperly influence the market. Plywood market periodical *Random Lengths* contemporaneously commented on the APA Product Advisory by saying it was met with

"mixed reactions." Some expected "minimal impact," whereas others thought "it could help domestic producers regain market share."

100.    *Random Lengths* reported on one Northeast distributor who summarized the general market sentiment succinctly: "Shipments of Brazilian plywood have increased this year and the APA producers [*i.e.*, the Coalition] are losing market share. The message is an attempt to create doubt as to the quality of all Brazilian plywood."

101.    With the APA Product Advisory falling flat, the Coalition had to pivot to a new plan: litigation.

102.    The attorneys Defendant Freres had contacted informed it that appropriate channels existed to resolve its "concerns" about Brazilian plywood (for example, the PS1 Standing Committee, neutral mediation through N.I.S.T. or the Department of Commerce, or even contacting Brazilian mills themselves), but those avenues would not spell immediate relief for the Coalition's early members. Even worse, those bodies had the technical expertise needed to utterly dispel the Coalition's claims.

103.    Freres soon found a lawyer who agreed to take the Coalition's case to court, and the other nascent Coalition members hatched a plan designed to avoid the obvious pitfalls associated with legitimate litigation.

104.    *First*, the primary target for a lawsuit would be entities that actually sell purportedly defective plywood: wholesalers and distributors. But there is significant overlap between domestic wholesalers and distributors who trade in U.S. and Brazilian plywood. The Coalition members could not target its own customers, and so this path had to be avoided at all costs.

105.    The *second* natural target for a lawsuit would be the Coalition's actual competitors, Brazilian plywood mills like M7 and Arbhores. The problem with that approach, however, was

that each Brazilian plywood mill (M7 and Arbhores included) maintains internal testing, inspection, and laboratory reports that easily disprove the APA test results and show, as has consistently been established through Brazilian plywood's unblemished three-decade U.S. market run, that no bending stiffness issues exist.

106.    So with the two primary targets of a lawsuit essentially being impractical or out-of-bounds, the Coalition set its sights on a *third* option: the two certifiers that then dominated the Brazilian PS1 market, PFS-TECO and TPI, along with their accreditation body, IAS.[2]

107.    But the initial Coalition members needed additional support from domestic mills to increase the value of their claims and leverage these certification and accreditation bodies into untenable and potentially extinction-level litigation conditions. At market conferences and industry gatherings, the initial Coalition members started a recruitment effort designed to bolster their forces to maximize their leverage. The inclusion of any one of the primary players in the U.S. plywood market – Georgia Pacific, Weyerhaeuser, Boise Cascade, or Roseburg – would have accomplished that goal, but none had any interest in what the Coalition was after.

108.    But there was a group of established mills on a secondary tier that expressed potential interest, provided Freres, Southern, and Scotch could substantiate APA's testing results.

109.    The objective was therefore clear: find a testing lab that would conclude that Brazilian plywood failed to meet PS1's bending stiffness requirements. The problem? APA's testing was highly flawed and its results were not likely to be duplicated by an accredited laboratory conducting a scientific test under ordinary conditions.

---

[2] A remarkable aspect of this plan was that many of the Coalition's members had been recently certified to PS1 by PFS-TECO and TPI. More remarkably, IAS was then the accreditor for APA as well as PFS-TECO and TPI. The Coalition therefore had to sue (i) not only its members' former certifiers; but (ii) its own certifier's accreditation body, claiming on the one hand that IAS was part of a scheme to facilitate the importation of "counterfeit" plywood from Brazil, even as IAS contemporaneously certified APA, which unabashedly promoted its North American members' interests.

110.    This turned out to be a solution, not an impediment.

111.    The Coalition's newly chosen counsel had a pre-existing relationship with a professor in Clemson University's College of Agriculture, Forestry, and Life Sciences. But Clemson was not qualified to perform the bending stiffness testing the Coalition wanted, its laboratory was not accredited, and it lacked the equipment to carry out the testing in any event.

112.    The Clemson University professor agreed to accept $85,000.00 from the Coalition to build out the machinery necessary to conduct the testing, staff it, and generate an ensuing report.

113.    When Clemson prepared to perform the testing, it assigned a faculty member with no experience in performing the specific test the Coalition requested. That faculty member delegated the vast majority of the actual testing to a graduate student.

114.    Worse still, the Coalition's attorney specified the conditions under which the testing would be performed, making clear that the panels would be selected in the first instance by the Coalition's members, again affecting the testing at the outset by self-serving sample bias.

115.    More significantly, the Coalition's counsel directed Clemson to test the panels in "as is" condition, specifically with respect to moisture content.

116.    Pre-existing moisture levels are one of the most direct and influential predictors of compromised bending stiffness in plywood. Instructing a testing laboratory to accept panels "as is" − with explicit directions not to regulate or standardize moisture content − renders any resulting bending stiffness test invalid and disqualifies it as a legitimate assessment of panel performance.

117.    Clemson nonetheless accepted these conditions, and Defendant Southern took the lead. It collected panels and stored them at its facility before shipping them to Clemson University.

118.    Little is known about the storage or shipping conditions, because with the Coalition pre-selecting the panels and insisting that Clemson accept the panels in "as is" condition, chain of custody documentation was rendered meaningless.

119.    The first shipment of panels Clemson received from Southern had visible signs of mold. Mold only grows on plywood where moisture levels well exceed the 15% threshold for reliable bending stiffness results

120.    One bundle of plywood received by Clemson was discolored and warped:



121.    Another was drenched, showing extensive water stains:



122.    Clemson discarded only the panels that had <u>visible</u> signs of mold, disregarding the fact that the moldy panels were shipped with panels that Clemson accepted for testing. Other panels had to be discarded due to delamination, waterlog, or other defects. Ultimately, <u>16</u> of the 96 total panels Clemson received were discarded. The 80 tested panels represent just .00035% of annual Brazilian plywood production.

123.    That infinitesimal sample size is statistically meaningless and renders any extrapolation invalid. Dr. Pang, the faculty overseer of the Clemson University testing, like Dr. Yeh of APA before him, therefore made clear in deposition testimony in the ensuing litigation that he completely disavowed any responsibility for the ultimate test results, stating only that Clemson was engaged for a specific task only: perform a bending stiffness test on panels received in "as is" condition and report on the results.

124.    Not at all surprisingly, Clemson's testing showed that 75% of the tested panels failed the bending stiffness test.

125.    That was enough for Freres, Southern, and Murphy to disseminate the Clemson test report in tandem with the APA Product Advisory as part of its recruitment campaign.

126.    Unlike APA, Clemson did not specifically test for bending strength, nor did it attempt to provide any scientific confirmation of the results.

127.    M7's panels were not tested at all. Just ten Arbhores panels were, and they passed in sufficient numbers that, under PS1's bending stiffness testing procedures and protocols, a further batch of testing should have been commissioned.

128.    The Coalition declined to do so.

## VII.    Plywood I – The Coalition Sues IAS, PFS-TECO, and Timber Products

129.    Immediately after the Clemson University testing was completed, Defendant Freres issued a press release falsely claiming that "structural plywood panels produced in South America are being fraudulently certified and stamped as compliant with U.S. Product Standard PS 1-09[3] for Structural Plywood, when the panels in fact do not meet the country's minimum structural requirements for stiffness and deflection."

130.    Freres minced no words in its press release:

Brazilian structural plywood panels have flooded America's domestic market over the last few years due to the strong U.S. dollar, lax environmental standards in the countries of origination, and a concerted effort by the Brazilian government to encourage wanton harvest. In the last two years, imported structural panel product volumes have grown to make up about 25 percent of the U.S. domestic market. A large portion of the volume of panels are manufactured using wood species harvested from large-scale plantations that were once rainforests.

131.    But rather than attempt to achieve resolution through existing channels (N.I.S.T., the PS1 Standing Committee, etc.), the Coalition commenced suit instead. Defendant Freres candidly admitted its motivation:

---

[3] PS 1-09 was the extant iteration of PS 1 when Freres issued this press release.

Q:    I mean, Tyler [Freres], you're a nice guy but you're also very smart, and you and I both know that the reason why you didn't call [IAS, PFS-TECO, and TPI] was not because you didn't think they had anything else to be adding. You didn't want to speak with them because you were gunning to go after them. Right?

You wanted PFS-TECO and TPI to no longer provide certifications to Brazilian plywood. Right?

A:    *__Absolutely__*.

Q:    Right.

So there's no reason for you to talk to them because you want something that you know they are not going to give. Right?

A:    Well, I had hoped that just by the [APA] product advisory that they would do something more like [*sic*]. We have reevaluated our programs, we have done due diligence, and we have decided not to certify the Brazilian panels name, or that was my true hope.

Q:    So your hope, as you just now conceded, is that you don't – the purpose of this lawsuit is so Timber Products and PFS-TECO no longer certify in Brazil.

[COALITION COUNSEL] MR. HAGLUND: Object to the form of the question.

Q:    That's your purpose. Right?  You just shook your head yes.

A:    *__Yes__*.

Q:    You've got to say it audibly for the record.

A:    *__I did say yes. Yes.__*

132.    To achieve this objective, the Coalition's lawsuit had to create a false public safety risk that none of its testing substantiated. Its complaint therefore uses inflammatory and alarmist language, falsely claiming:

The failure of PFS-TECO and TPI to perform their quality control functions as authorizes licensors of the PS 1-09 grade stamp has resulted in millions of square feet of falsely advertised off-grade Brazilian plywood moving into the U.S. and being incorporated into residential and commercial buildings. As a result, U.S.

residents who live or work in buildings with off-grade Brazilian plywood are exposed to significant risk of serious injury or death, particularly in the event of a hurricane or significant earthquake.

(emphasis added).

133.    This was, and is, a lie. Bending stiffness nonconformities (contrasted against bending strength), is nothing more than a comfort issue. Even if APA and Clemson's testing were legitimate, it revealed nothing more than serviceability concerns, not a public safety threat.

134.    After initial discovery in Plywood I was conducted, the Coalition filed a preliminary injunction seeking a Court order halting the importation of all Brazilian plywood. About one week later it moved to unseal the preliminary injunction filings to take public the documents PFS-TECO and TPI exchanged in discovery under a confidentiality designation.

135.    The motion to unseal purports to claim that Brazilian plywood posed a public safety concern, and the U.S. District Court granted the Coalition's motion to unseal due to the "public interest" associated with its use, even as it then went on to deny the preliminary injunction application.

136.    With PFS-TECO and TPI's confidential business records now having been made public, the Coalition pounced. It cherry-picked and decontextualized vast swaths documentation in a submission to the PS1 Standing Committee, seeking primarily to strip TPI and PFS-TECO of their accreditations while also asking the PS1 Standing Committee to issue negative determinations on a range of their practices, including (i) qualification testing procedures; (ii) granting interim approvals [*i.e.*, allowing a mill to use a PS1 stamp based on an interim approval pending complete qualification testing]; (iii) using subcontractors as inspectors; and (iv) allegedly inadequate ongoing inspection and testing intervals.

137.    But the PS1 Standing Committee ***rejected*** the Coalition's claims. It declined to strip PFS-TECO and TPI of their credentials, and it found no issue with their use of (i) testing procedures; (ii) interim approvals; (iii) using subcontractors as inspectors; and (iv) frequency of inspection and testing.

138.    That did not stop the Coalition from asserting in Court that its members interpreted PS1 to include the very requirements the PS1 Standing Committee expressly held were not included or otherwise suggested by the Standard.

139.    PFS-TECO, TPI, and IAS each attempted to defend Plywood I on its merits, but with demonstrably false "public safety" allegations and a claim of $150 million in damages, TPI and IAS settled with the Coalition after their initial dismissal motions were denied, by agreeing to vacate the Brazilian market and support reforms to the PS1 Standard.

140.    As for PFS-TECO, when its motion for summary judgment was denied, it stipulated to a consent injunction that required it to vacate the Brazilian market and not return until a multi-year testing and inspection regimen was undertaken.

141.    This was a <u>voluntary</u> settlement made by PFS-TECO to avoid the risk of a jury trial. No findings of fact or conclusions of law were ever made. The Coalition merely survived a summary judgment through a systematic use of manufactured test results, unsubstantiated claims about their interpretation of PS1, and false public safety concerns.

142.    With IAS, PFS-TECO and TPI unable to accredit or certify Brazilian plywood, M7, Arbhores and other Brazilian mills were left with no options to certify their product and allow it into the U.S. As such, a litigation campaign built on distortion succeeded where science and standards had not, forcing Brazilian plywood out of the U.S. market without any finding of

wrongdoing by a U.S. District Court, and with the PS1 Standing Committee having exonerated PFS-TECO and TPI of the Coalition's accusations.

## VIII.   The Coalition's Public Misrepresentations During Plywood I

143.    Plywood I was a litigation in name only, an effort not to remedy genuine safety concerns, but to eliminate certification and accreditation bodies from the Brazilian market, just as Defendant Freres admitted under oath.

144.    But the Coalition faced a problem: its claims lacked industry credibility. Wholesalers and distributors recognized them as fabrications aimed solely at eliminating foreign competition, and soon new certifiers began emerging to fill the void PFS-TECO and TPI left.

145.    TPI was the first of the two to exit the Brazilian market in 2021. At that time, with PFS-TECO still mired in litigation, and APA certifying only North American products, only one certifier with an ongoing PS1 program existed to take its place: Benchmark Holdings LLC, d/b/a Benchmark International.

146.    Benchmark was a known commodity in the plywood industry, and several Brazilian mills contacted it after TPI's exit from the market.

147.    The Coalition immediately commenced an interference campaign.

148.    In May 2021, just as Benchmark began making preparations to assume TPI's former position in the Brazilian market, the Coalition issued a "cease and desist" letter, disseminating false information about the quality of Brazilian plywood, mischaracterizing the outcome of the Plywood I settlement with TPI and IAS, and threatening litigation if Benchmark began certification operations in Brazil on market terms.

149.    Under direct threat, Benchmark paused its entry into the Brazilian market in 2021,
leaving PFS-TECO (then mired in litigation) as the only certifier with an existing PS1 program
willing to have operations in Brazil.

150.    The Coalition's use of misrepresentations and lies to (temporarily) coerce
Benchmark out of the market was consistent with its inflammatory, public-facing communications
while litigation was underway.

151.    By press release dated June 9, 2020, the Coalition broadcast its overall intention of
"stopping the increasing volumes of Brazilian plywood stamped PS 1-09 flowing into the U.S. that
is so off-grade that it poses a serious health and safety risk to the U.S. public. The purpose of this
letter is to strongly recommend that all U.S. importers or resellers of Brazilian PS 1-09 plywood
stop importing structural plywood from Brazil and quarantine whatever they have in inventory in
the U.S."

152.    This press release was directed to "U.S. Importers and Resellers of Brazilian PS 1-
09 Plywood," which are M7 and Arbhores's customers.

153.    The press release further noted that the Coalition had moved for a preliminary
injunction in its remaining case against PFS-TECO in Plywood I (which was denied), and
threatened M7's customers with the following warning:

> A decision by Judge Altman to require PFS-TECO and TPI to revoke all 34 of the
> PS 1-09 certificates those agencies have issued to Brazilian plywood mills will
> mean that a federal judge has concluded that the coalition is likely to win on its
> claim that Brazilian structural plywood stamped PS 1-09 is a knock-off or
> counterfeit product that poses a significant health and safety risk to U.S. consumers.
> **This would expose all importers or resellers who continue to sell Brazilian
> plywood with PS 1-09 grade stamps to potential liability for false advertising
> under the Lanham Act. If an injunction is issued, any reasonably prudent
> importer or reseller of Brazilian plywood should quarantine that product until
> the PS 1-09 stamps are removed.**

(emphasis in original).

The message to customers was clear: continue buying Brazilian plywood and risk federal litigation, based on claims that no court or agency had validated.

154.    In addition to disseminating the press release to Arbhores and M7's customers, the Coalition also sent it to "every building code official association in the United States and the more than 50 national and state home builders associations in this country," a point that is stated in the release itself.

155.    Defendant Freres issued a press release too, titled "Product Advisory Warns of Unsafe Plywood from Brazil Sold in American Markets – Testing Proved Imported Brazilian Plywood Panels Have Massive Failure Rates." Like the broader press release targeted to Arbhores and M7's customers and Building Code officials throughout the United States, Freres's press release stated that its purpose was to "strongly recommend that all U.S. importers and resellers of Brazilian PS 1-09 plywood stop importing structural plywood from Brazil and quarantine whatever they have in inventory in the U.S. for the health and safety of consumers."

156.    Freres's news release repeatedly refers to all Brazilian plywood as "substandard," "unsafe," and "potentially dangerous." As recently as 2024, Freres gave an interview where it called all Brazilian plywood, which includes M7 and Arbhores's products, "bottom feeder."

157.    And though neither M7 nor Arbhores have ever been implicated by legitimate testing, Freres nonetheless included them in its new release, stating that "[t]he substandard plywood is produced by 34 plants in southern Brazil."

158.    This barrage of disinformation set the table for the events causing M7 and Arbhores's monetary damages: the Coalition's misleading attempt to link PFS-TECO's voluntary settlement with the APA's Product Advisory.

**IX.    The Coalition's Litigation Efforts and Public Misinformation Campaign Failed to Affect the Market, So its Members Resort to Falsely Representing the Outcome of Plywood I**

159.    No court or any regulatory body has ever made any finding that Brazilian plywood certified under PS1 poses a safety risk, is off-grade, or is counterfeit.

160.    The Coalition reached a final settlement of Plywood I with PFS-TECO with no findings of fact or adjudications of law. They instead agreed to a consent injunction, which was endorsed by the U.S. District Judge presiding over Plywood I, and set parameters for PFS-TECO's exit from the Brazilian PS 1 market and its future potential re-entry.

161.    PFS-TECO never consulted Arbhores or M7 regarding the terms of its agreement with the Coalition. M7 and Arbhores therefore had no control over PFS-TECO's actions or the stipulation it agreed to. The Coalition refused to engage in any dialogue with any Brazilian mill, choosing scorched earth rather than a targeted strategy to address legitimate concerns. So M7 and Arbhores had no opportunity to salvage their certification programs or otherwise show their compliance with PS1.

162.    The Coalition had previously attempted, without success, to use the APA Product Advisory and press releases regarding Plywood I to influence the market. With Benchmark having temporarily paused its efforts to fill TPI's void in the certification market under direct threat, the Coalition embarked on its attempt to end M7 and Arbhores's access to the U.S. market for good.

163.    PFS-TECO's consent injunction became effective on May 31, 2022. At that exact time, the Coalition disseminated it to every building inspector in every county in the U.S., together with the widely disbelieved (and roundly rejected) APA Product Advisory, falsely claiming that the voluntary settlement of Plywood I was instead a determination by a U.S. District Court that

"forces wholesalers and retailers to immediately consider these products off-grade and to either obliterate the PS 1 stamp on the plywood before resale or destroy it."

164.    These statements were knowingly false. The injunction contained no such requirement, and no court ever found any defect in the plywood.

165.    Only by misleadingly linking the consent injunction to the APA Product Advisory and attempting to claim a U.S. District Court had made adjudications of fact and determinations of law, the Coalition was finally able to succeed on its yearslong attempt to affect the market.

166.    On June 15, 2022, Jaime D. Gascon, P.E., the head of the Board and Code Administration Division for Miami-Dade County in Florida distributed an "ADVISORY MEMO," titled "Brazilian Plywood," and repeated the Coalition's false statements regarding the quality of Brazilian plywood. The Advisory Memo concludes:

> Building officials and inspectors should be made aware of these inferior Brazilian Plywood products bearing the PS-1 stamps and not accept these stamps as a means of indicating code compliance.

167.    At the same time, the Coalition contacted numerous industry periodicals read by tens of thousands in the building industry, materially misrepresenting the consent injunction endorsed by the U.S. District Judge assigned to Plywood I. A representative sample of the ensuing headlines included:

- "Florida lawsuit bans Brazilian plywood due to poor quality, safety risk" (the Construction Specifier);

- "Warnings of Inferior Brazilian Plywood Imported to U.S. Sent to Florida Building Officials and Inspectors" (BusinessWire);

- "Judge's Injunction Stops Sale of Brazilian Plywood in Plywood Safety Lawsuit – Homes Built with Off-Grade Brazilian Plywood Face Greater Risk from Future Hurricanes" (Fastmarkets);

- "Lawsuit Highlights Inferior Brazilian Plywood and False Certification" (National Roofing Contractors Association).

168.    These headlines repeat as true that which is verifiably false, that Brazilian plywood was adjudicated to be of "poor quality," "inferior," "off-grade," and poses a public safety "risk."

169.    Nearly all these articles contain contact information for the Coalition's attorney or one of its members, or both, clearly linking the article to the Coalition's efforts to besmirch Brazilian plywood.

170.    This barrage of false and misleading information led PFS-TECO to issue its own press release, attempting to clarify the outcome of Plywood I and ensure that wholesalers and retailers of plywood understood that no determination had been made by either the judge or a jury regarding the Coalition's claims.

171.    PFS-TECO's press release stated, in pertinent part, the following:

On May 23, 2022, PFS TECO and the U.S. Structural Plywood Integrity Coalition agreed on the terms of a permanent injunction to settle the ongoing dispute between them. On the following day, according to the terms agreed by the parties, the Judge issued a permanent injunction under which PFS TECO exits the certification market for PS 1 rated plywood in Southern Brazil. The case was settled before the jury trial took place and/or the Court has made any determination on the case's merits. Therefore, the federal district court has not made any determination concerning the accuracy of the plaintiffs' allegations concerning the 'strength' of the Brazilian plywood bearing the PFS TECO stamps or what 'wholesalers and retailers' must or should do regarding existing stocks of the labeled product.

Indeed, the injunction does not prohibit, limit, or restrain the sale and/or use of the products labeled with PFS TECO mark on or before May 31, 2022. The injunction entered by the Court addresses only future actions of PFS TECO. The injunction was made without any findings of fact about the products that have been labeled. The injunction specifically does not order the removal or obliteration of any label applied to the product on or before May 31, 2022.

172.    Despite the efforts undertaken by PFS-TECO, for M7 and Arbhores, the damage had been done: the Coalition's misinformation campaign targeted builders and contractors, falsely claiming that the products they implemented in construction over the previous years posed significant safety risks.

173.    Industry periodicals began circulating whitepapers with headlines such as "The Brazilian Plywood Situation." One such periodical, issued by insurance advisor IMA, observed the logical conclusion of the Coalition's claims, in article including a heading titled, "The Challenge for Builders and Contractors":

> Over the past five years, builders and contractors across the U.S. have used Brazilian plywood in new residential and commercial structures, as well as in the renovation of properties in the eastern U.S. that were damaged by hurricanes and flooding. As many as 2 billion feet of this now uncertified, substandard plywood stamped "PS 1-09," entered the U.S. in the past two years. It accounted for 11% of the U.S. supply in 2021 alone.

> Builders and contractors used these materials in good faith, with every expectation and assurance that the plywood met or exceeded U.S. standards, given the "PS 1-09" certification label on the product. These materials are now an integral, but possibly increasingly unstable, component of their recent construction projects.

174.    These industry advisories avoided seeking comment from Brazilian mills or their trade associations, and good faith efforts by Arbhores and M7's sales teams fell flat. Brazilian plywood had indeed transformed into Chinese drywall: it was toxic.

175.    In December 2022, insurance risk assessment firm Verisk Analytics posted an advisory titled, "Brazilian Plywood Ban Risks and Historical Examples," which lists the following bullet points as "Key Takeaways":

- In May of 2022, a federal judge effectively banned the importation of a significant number of Brazilian plywood products into the U.S. due to severe safety concerns;

- This is notable because more than 10% of U.S. plywood is/was imported from Brazil, due in large part to favorable prices;

- Buildings constructed overt the past few years utilizing Brazilian plywood may no longer be considered safe, and some legal experts speculate that builders themselves may be forced to offer remediation – in addition to incurring other losses such as the mandated destruction of their current stock of Brazilian plywood.

-    Some experts have begun to compare Brazilian plywood to Chinese drywall, a material that caused substantial losses in the mid 2010's under similar circumstances.

176.    Verisk was hardly alone. The National Roofing Contractors Association repeated

and amplified the Coalition's claims, stating:

> Distributors holding the substandard plywood in inventory should consider it to be defective. <u>Therefore, they should destroy the plywood or remove the PS 1 stamp from every panel before resale. There have been a variety of safety and structural-related concerns with its usage</u>.
>
> In 2021, nearly 1.2 billion square feet of Brazilian plywood was sold in the U.S., accounting for about 11% of the U.S. supply. Because it is cheaper than U.S. plywood, it is attractive to contractors; but as this case illustrates, some materials are cheaper for a reason.
>
> . . .
>
> <u>[C]ontractors may want to consider allocating a reserve if they known the defective plywood was used and should check existing stock to ensure they dispose of the affected product</u>. Contractors also should recognize any communications with distributors or third-parties about the plywood may be discoverable.

(emphasis added).

177.    Beginning in June 2022 and continuing to the present, the Coalition achieved

significant success where its litigation and petitioning efforts had failed. M7 and Arbhoers had no

certifier, and their market had been catastrophically poisoned by a coordinated industry

misinformation campaign.

**X.    Plywood II – the Coalition Sues Forestwood and A2LA**

178.    Forestwood Industries, Inc. had maintained an active certification program in Brazil

and elsewhere pertaining to California Air Resources Board ("C.A.R.B.") formaldehyde emissions

since the early 2000's. Its principal has longstanding relationships with many Brazilian mills and

broad expertise in wood products certification programs.

179.    When PFS-TECO joined TPI in exiting the Brazilian market, many Brazilian mills (including those who had contacted Benchmark) reached out to Forestwood to ask if it had the ability to provide certifications to PS1.

180.    Forestwood, in turn, applied to its accreditor, the American Association for Laboratory Accreditation ("A2LA") for a scope expansion on its existing C.A.R.B. program to include PS1 and, consistent with industry norms, A2LA approved the scope expansion.

181.    M7 was in the process of obtaining PS1 certification through Forestwood at the time the Coalition commenced *U.S. Structural Plywood Integrity Coalition v. Forestwood Industries, Inc. et al.*, Case No. 22-cv-60976 (S.D. Fla.) ("Plywood II"), and Arbhores was in the process of evaluating the existing market at that time. The initiation of the lawsuit dramatically impacted the certification process for both entities.

182.    The Coalition commenced Plywood II just three weeks after the U.S. District Court for the Southern District of Florida issued the consent injunction concluding Plywood I.

183.    The Coalition never tested a Forestwood panel. It never contacted Forestwood or attempted any other outreach before resorting to litigation. Once served, Forestwood made numerous representations to the Coalition members that it would engage in good faith discussions to attempt to address legitimate concerns, but those overtures were met with aggression, as exemplified by its counsel's summation following a preliminary injunction application:

> Quite frankly, we've learned one lesson from this episode. Given the positions advanced by Forestwood and A2LA in this case, the plaintiff coalition is absolutely committed to taking this Lanham Act case to trial and will not entertain a settlement with either – either party because we cannot run the risk of another Forestwood Whac-A-Mole . . .

184.    For the Coalition, therefore, a qualified certification body like Forestwood was like the target in the *Whac-A-Mole* arcade game – a pest to be snuffed out and extinguished.

185.    The Coalition's position in Plywood II was specific. It claimed that the "world was put on notice" of defects in Brazilian plywood following Plywood I, and that the consent injunction PFS-TECO agreed to set a baseline standard for any certification body wishing to do business in Brazil. It therefore contended that Forestwood – or any other certification body attempting to operate in Brazil – was required to adhere to a "heightened" PS1 Standard exclusive to Brazil.

186.    If a certifier disagreed with the Coalition's interpretation of such a "heightened" PS1 Standard, litigation would be the result, to exterminate the *Whac-A-Mole* pest. The Coalition claimed that Forestwood was the target of Plywood II because the PFS-TECO consent injunction was a "public judicial order taking extraordinary action."

187.    In this way, the Coalition transformed its private settlement with PFS-TECO into a heightened PS1 Standard with a Brazil-specific requirement and used it as a private enforcement tool, thus becoming the self-deputized enforcement wing of a *Voluntary* Product Standard with no regulatory enforcement mechanisms.

188.    Facing heavy pressure from the Coalition, A2LA temporarily suspended Forestwood's accreditation on highly dubious, pretextual grounds. Contrasted with A2LA's internal protocols and standard industry practice, A2LA did not provide stated reasoning for the suspension and stated that an opaque, non-appealable process would be undertaken to come to a final determination. The message was clear: Forestwood's certification was put under a microscope, and A2LA, a not-for-profit corporation being defended on an eroding professional liability insurance policy (just like IAS, PFS-TECO, and TPI before it), could not bear the risk of an extinction-level lawsuit.

189.    The Coalition was therefore able to use litigation based on false pretenses to force Forestwood out of the PS1 market.

190.    Its members also continued to disseminate false and misleading information.

191.    Lacking any information about Forestwood and despite its dismissal from Plywood II with prejudice after it involuntarily withdrew from the PS1 market, the Coalition, through its counsel and constituent members, issued press releases widely disparaging Forestwood and Brazilian plywood in general.

192.    Representative examples of the Coalition's press releases include:

-    "Brazilian Plywood Manufacturers Circumvent Permanent Injunction with Unqualified Certification Body, Forestwood Industries" (BusinessWire);

-    "US Lawsuit Bans Brazilian Plywood Due to Poor Quality" (Timber Industry News).

193.    Again, these articles often included direct contact information for the Coalition members or their counsel, confirming that the Coalition was the primary source of the false and misleading information disseminated to the public.

194.    The Coalition's efforts paid off handsomely. In July 2022, Brazilian plywood exports fell 62% year-on-year, with volume falling by 40%. That followed a 38% year-on-year decrease in May 2022, and a 27% year-on-year decrease in June 2022.

195.    Despite this severe decrease in market supply, the Coalition continues to threaten M7 and Arbhores's customers with litigation, as evidenced by a blog post from Freres's website following Forestwood's exit:

> Considering every certifier faced with scrutiny has ended up losing their accreditation or abandoning the Brazilian market, it makes one wonder how long importers will be willing to take the risk of buying these panels. At this point, it should be clear that there is significant risk to these imported panels and buyers can hardly claim ignorance.

196.    Plywood II therefore was not a good-faith attempt to protect public safety. It was the next in a series of calculated strikes, part and parcel of the Coalition's ongoing campaign to eliminate Brazilian plywood from the U.S. market through fear, confusion, and legal attrition.

**XI.    The Coalition Members' Known Violations of PS 1**

197.    A remarkable aspect of the Coalition's actions is that many of its members were once certified by the bodies they later sued: PFS-TECO and TPI. To advance their claims that PFS-TECO or TPI were not sufficiently monitoring the quality of Brazilian plywood, many of the Coalition's members were also forced to allege that they also suffered significant quality lapses during their time of certification by PFS-TECO and TPI.

198.    Many of the Defendants therefore openly admitted to multi-year violations of PS1. In sworn deposition testimony, a representative of Southern Veneer Products admitted;

Q:    As we just discussed in your declaration you also state that between 1994 and 2009 that Southern Veneer Products used [PFS-TECO] as its inspection and certification agency; is that right?

A:    That is correct.

Q:    And between 1994 did Southern Veneer Products produce plywood that was substandard to the PS 1 standard?

A:    Correct.

[COALITION COUNSEL] MR. HAGLUND: Object. Could you give the date range that you were – I didn't hear whether you gave a specific date range. I heard '94. I didn't hear anything else. I may have missed it.

Q:    Yeah, between 1994 and 2009 are you alleging that Southern Veneer Products produced plywood that was substandard?

A:    Correct.

199.    The Coalition is therefore aware that one of its members – Southern – committed PS1 violations for <u>fifteen</u> <u>years</u>. And yet, Southern remains within the ranks of the "U.S. Structural Plywood *Integrity* Coalition," and is among its founding members.

200.    Southern is not alone, it is just the most blatant example. Multiple Coalition members admitted PS1 violations of varying degrees and timeframes, yet none has turned on each

other. The reason is clear: they do not wish to "protect" the PS1 Standard because it never needed protecting in the first instance.

201.     The Coalition's aim is, and always has been, simply to eliminate competition from Brazil. And in that regard, it has been wildly successful.

## XII.    The Coalition's Illegal Activities Have Eliminated PS1 Certifiers from the Brazilian Market

202.     Brazilian mills once exported 60 to 120 million square feet of PS1-compliant plywood per month to the U.S. Today, due to the absence of a reliable market of PS1 certifiers, that number has collapsed.

203.     The Coalition's only path to "success" has been through a sustained campaign of coercion, misinformation, and legal abuse, each in violation of federal law.

204.     When Forestwood was forced to abandon the market, M7 and other Brazilian mills sought out PS1 certifications through other certification bodies.

205.     They found no takers.

206.     One certification body began the process of certifying one of Arbhores and M7's Brazilian mill counterparts, but abruptly shifted course when "senior leadership has decided not to pursue your certification project." Another began reviewing the mill's application but concluded "due to lawsuits and history," it would "have to pass on certifying plywood materials at this time." These refusals were not based on any deficiency in the mill's long-established capability at meeting PS1, but rather the certifiers' fear of litigation and reputational harm stemming from the Coalition's campaign.

207.     Although it initially succumbed to the Coalition's threats, it later appeared that Benchmark would agree to fill the void. That hope has long since vanished.

208.    Whether under direct pressure from the Coalition or as a result of its intimidation campaign, Benchmark now certifies just a small subset of Brazilian clients, and does so under commercially onerous terms. It charges inflated fees, imposes conditions disconnected from typical market practices and in exorbitant excess of what PS1 actually requires, and it is unwilling to certify the vast majority of products or clients previously certified by PFS-TECO, TPI, or Forestwood.

209.    In other words, Benchmark is yet another cog in the Coalition's machine, perhaps not as a victim, but now as a tool. Benchmark essentially serves as a flow regulator, artificially reducing the market under direct threat of litigation.

210.    Accreditors have followed suit.

211.    IAS, a defendant in Plywood I, continued to certify Benchmark, now the only U.S.-based certification body willing to accept any Brazilian PS1 clients. But IAS abruptly shifted course in June 2024, completely abandoning its PS1 accreditation program worldwide.

212.    A2LA, still a defendant in Plywood II, has represented in judicial filings that it has left the PS1 accreditation market for good.

213.    As a result, the only certification body willing to enter the Brazilian market on standard terms is Plaintiff I.B.C.I. I.B.C.I. was only able to secure accreditation to PS1 through INMETRO, an administrative wing of the Brazilian government.

214.    No known U.S. companies are willing to provide PS1 accreditations in Brazil on market terms.

215.    In short, as a direct result of the Coalition's illegal conduct, the entire infrastructure for Brazilian plywood exportation has collapsed. This is not the outcome of healthy market

44

competition, but the result of a targeted campaign to eliminate lawful competitors through coordinated fear, disinformation, and coercion.

### XIII.   The Consumer Harm Resulting from the Coalition's Coordinated Efforts

216.    The Coalition's efforts have reduced competition and resulted in artificially increased prices for the U.S. consumer.

217.    Following the 62% year-on-year decrease in importation of Brazilian plywood in July 2022, the trend continued. In January 2023, the year-on-year declined 39%.

218.    The market periodical FastMarkets chalked the decline to the following:

In May 2022, a US district court revoked certificates and grade stamps issued to plywood imported from Brazil for structural use in US markets. Ongoing issues with certification contributed heavily to the decline in imports from Brazil.

219.    In the months following Forestwood's exit from the market, FastMarkets issued a headline stating, "US market is feeling reduction of Brazilian plywood imports."

220.    Since its peak in 2021, imports of softwood plywood originating from Brazil have been decimated multiple times over, reducing consumer purchasing options, and generally resulting in prices above market due to the marked decrease in the presence of Brazilian plywood.

221.    New York is the largest consumer of Brazilian plywood and its consumers have been disproportionately impacted through the Coalition's efforts, with 31% of all Brazilian plywood consumed domestically being imported through New York Harbor for consumer use within the State of New York.

222.    No other State or port of importation approaches the disproportionate impact suffered by New York consumers, with the next closest State being Florida, which in 2021 received approximately 20% of total Brazilian softwood plywood imports, over one-third less than that received in New York and integrated into building construction in that State.

## AS AND FOR A FIRST CAUSE OF ACTION

### (Direct False Advertising in Violation of the Lanham Act)

223.    Plaintiffs repeat, reiterate, and reallege the foregoing paragraphs 1 through 222 with the same force and effect as if set forth at length herein.

224.    The Coalition, through its constituent members and those authorized to act on its behalf, repeatedly made false statements of fact by issuing "Product Advisories," press releases, making direct statements to M7 and Arbhores's customers, posting website "blog" entries, and commencing sham litigations, based on the demonstrably untrue statement that Brazilian plywood cannot meet PS1's criteria, was a public safety threat, and must be considered "off grade."

225.    Since June 1, 2022, the Coalition materially misrepresented the outcome of Plywood I, claiming to Building Code officials, Arbhores and M7's clients, and the broader consuming public that a U.S. District Court made determinations of fact and law establishing life safety concerns and other deficiencies in Brazilian plywood and otherwise misrepresenting the consent injunction entered in that case.

226.    These false and misleading statements directly impacted Arbhores and M7's ability to secure certification to PS1, and I.B.C.I.'s ability to secure accreditation to PS1, and directly impacted their relationship with their clients and the broader consumer public.

227.    Since June 1, 2022, M7 and Arbhores's ability to produce PS1 plywood has been completely undermined as a direct causal result of the Coalition's false and misleading statements, notwithstanding the absence of any credible evidence implicating M7 or Arbhores, their production capabilities, or their quality control/quality assurance protocols.

228.    The Coalition's blatant and wanton abuses have impacted not only M7, Arbhores, and I.B.C.I. but it has sowed confusion and doubt regarding PS1 building products originating from Brazil in the consumer public at large.

229.    Under the circumstances, M7, Arbhores, and I.B.C.I. are entitled to an award of exemplary damages and an award of its reasonable attorneys' fees in prosecuting this action.

230.    Until appropriate injunctive relief is issued necessitating that the Coalition cease and desist its materially false and misleading statements, M7 and Arbhores will continue to incur damages.

231.    Assuming a trial date of May 2027, M7, Arbhores, and I.B.C.I. will have suffered damages totaling no less than $68.085 million, with the exact amount to be proven at trial.

### AS AND FOR A SECOND CAUSE OF ACTION
### (Conspiracy to Restrain Trade in Violation of 15 U.S.C. § 1 [the Sherman Act])

232.    Plaintiffs repeat, reiterate, and reallege the foregoing paragraphs 1 through 222 with the same force and effect as if set forth at length herein.

233.    Section 1 of the Sherman Act (15 U.S.C. § 1) prohibits, among other things, agreements or arrangements that unreasonably restrain competition.

234.    Defendants, individually and collectively as members of the U.S. Structural Plywood Integrity Coalition, have engaged in a horizontal conspiracy to restrain trade and suppress competition in the market for structural plywood products in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

235.    The relevant product market is PS1 structural plywood. The relevant geographic market is the United States, as Brazilian PS1 plywood directly competes with U.S.-produced PS1 plywood within the defined market.

236.    Plaintiffs M7 and Arbhores, specifically, are direct competitors of the Defendants within this market. Plaintiffs produce and sell PS1-compliant structural plywood products, and Plaintiff Arbhores and M7's products have been lawfully imported into and sold in the U.S. for years. Brazilian plywood has been imported and sold in the U.S. for more than three decades.

237.    Arbhores and M7's products are directly interchangeable with the Defendants' structural plywood products. They compete for the same end-users, and their products are substitutable in use by U.S. consumers and builders. As such, Plaintiffs and Defendants compete in the same relevant product and in the same geographic market.

238.    The Coalition and its Defendant members, through coordinated and concerted action, have engaged in an unlawful agreement or conspiracy in restraint of trade and commerce. They conspired to exclude Brazilian structural plywood producers, including Plaintiffs M7 and Arbhores, from the relevant market by engaging in a pattern of false and misleading statements, sham litigation, intimidation of certifiers, and the dissemination of false product advisories and other public-facing communications. These concerted actions are not reasonably related to any pro-competitive or legitimate business justification, or any legitimate petitioning activity. They directly target the Plaintiffs as market competitors.

239.    The Coalition combined its members' monetary and non-monetary resources with the direct and stated intention of seeking "retaliation" against a common source of competition, using its members' positions on APA's various boards and committees, and its attorneys as mouthpieces to broadcast intentionally false claims, materially misrepresenting the quality and nature of PS1 plywood produced in Brazil. They not only agreed to combine their monetary resources and their industry credentials to directly impact the market, but they also agreed to disregard each others' known and provable violations of PS1.

240.    Defendants' conspiracy has had the purpose and intended effect of substantially restraining trade in the relevant market by eliminating Brazilian structural plywood producers from the U.S. market, thereby artificially raising prices, reducing output, and limiting choice for U.S. consumers.

241.    As of the filing of this Complaint, M7, Arbhores, and I.B.C.I. have been damaged in the amount of $43,083,000.00 dating from June 1 2022, with damages continuing to accrue. Assuming a May 2027 trial date, M7, Arbhores, and I.B.C.I. will have sustained total damages no less than $68,585,000.00.

242.    Pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, M7, Arbhores, and I.B.C.I. are entitled to an award of treble their actual damages, as well as attorneys' fees, in an amount to be proven at trial but totaling no less than $205.755 million.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Contributory False Advertising in Violation of the Lanham Act)

243.    Plaintiffs repeat, reiterate, and reallege the foregoing paragraphs 1 through 222 with the same force and effect as if set forth at length herein.

244.    Defendants, collectively forming the "U.S. Structural Plywood Integrity Coalition," have knowingly and intentionally contributed to the false and misleading advertising regarding structural plywood produced in Brazil, including Plaintiffs' PS1-certified products.

245.    Defendants' coordinate false statements about Brazilian PS1 plywood directly injured Plaintiffs by diverting sales, causing reputational harm, and upending their ability to participate in the U.S. market.

246.    Each Defendant, even if not the direct speaker or disseminator of every false statement, knowingly and materially contributed to the broadcasting and amplification of false and misleading statements made by other Coalition members, their representatives, and their shared legal counsel. This included but was not limited to:

    a.    Funding, participating in, and publicly endorsing false "Product Advisories," press releases, and other market communications made by Coalition members and their representatives;

b. Participating in litigation campaigns designed to give false statements a veneer of legitimacy with the purpose and intent of intimidating certifiers and accreditors into abandoning the Brazilian PS1 market, thereby contributing to a materially false advertising scheme;

c. Distributing and re-publishing misleading statements to customers, building code officials, contractors, and trade groups throughout the United States, including statements that falsely claim claims that Plaintiffs' products failed to meet PS1 standards and posed significant safety risks;

d. Contributing to and amplifying the false and misleading narrative that the consent injunction entered in Plywood I represented a judicial determination that Brazilian plywood is off-grade or dangerous, when no such finding was ever made by any Court or agency.

247. Defendants knew or should have known that these statements were false and misleading. Their actions were deliberate and coordinated, designed to deprive Plaintiffs of lawful access to the U.S. structural plywood market and to restrict competition by misrepresenting the quality and safety of Brazilian plywood, with a direct emphasis on impacting purchasing decisions in the State of New York and elsewhere, with the probable and intended effect of causing direct monetary damages and reputational injury to M7, Arbhores, and I.B.C.I.

248. As a direct result of these actions, Plaintiffs' companies suffered actual and calculable damages, in an amount to be determined by a jury but in no event less than $68,585,000.00.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Tortious Interference with Contract)

249. Plaintiffs repeat, reiterate, and reallege the foregoing paragraphs 1 through 222 with the same force and effect as if set forth at length herein.

250. Plaintiffs M7 and Arbhores had valid and enforceable contracts with non-party PFS-TECO for the certification of their PS 1 plywood. Following PFS-TECO's coerced exit from

the Brazilian market, M7 entered into an agreement with Forestwood Industries, Inc. to re-commence its PS1 certification program.

251.    Defendants had actual knowledge of these contractual relationships between Plaintiffs and their certifiers and their prospective certifiers, including known non-party certification bodies who would have provided PS1 certification services in Brazil but for Defendants' interference.

252.    Defendants in sworn testimony and public statements that they "***absolutely***" commenced sham litigations and engaged in other coercive acts for the sole and specific purpose of interfering with valid and enforceable contracts between Plaintiffs and their certifiers.

253.    Consequently, Plaintiffs suffered actual and calculable damages, including lost business opportunities, lost revenue, and reputational harm, in an amount to be determined at trial but in no event less than $68.585 million.

### AS AND FOR A FIFTH CAUSE OF ACTION
**(Violation of N.Y. Gen. Bus. Law § 349)**

254.    Plaintiffs repeat, reiterate, and reallege the foregoing paragraphs 1 through 222 with the same force and effect as if set forth at length herein.

255.    New York Gen. Bus. Law § 349 applies to deceptive trade practices in relation to "virtually all economic activity."

256.    Defendants have engaged in false and materially misleading advertising and statements regarding the quality, safety, and PS1 compliance of Plaintiffs' products, as well as Brazilian plywood generally.

257.    The Defendants have falsely categorized all Brazilian plywood as "off-grade," "inferior," and "counterfeit," and have described it in other pejorative terms without a substantial basis in fact.

258.    These false and deceptive statements were widely disseminated to building officials, contractors, end users, and the general public in New York State, the largest market for Brazilian PS1 plywood and the site of import of the largest volume of Brazilian plywood.

259.    Such deceptive acts and practices have had a significant and broad impact on Bew York consumers by artificially limiting their choices in the plywood market, driving up prices, and restricting access to quality Brazilian plywood that fully complies with PS1 standards.

260.    Plaintiffs, as producers and certifiers of Brazilian plywood, have suffered direct injury as a result of this consumer deception, including lost revenue, market share, and reputational harm, in an amount to be determined at trial but in no event less than $68.585 million.

261.    Plaintiffs therefore seek injunctive relief prohibiting the Defendants from continuing to advance its false claims, and recovering actual damages in an amount to be determined at trial, treble damages to the extent allowed by law, and recovery of reasonable attorneys' fees as provided by N.Y. Gen. Bus. Law § 349.

## AS AND FOR A SIXTH CAUSE OF ACTION

### (Declaratory Judgment on Behalf of I.B.C.I. Pursuant to 28 U.S.C. §§ 2201-2202)

262.    Plaintiff I.B.C.I. repeats, reiterates, and realleges the foregoing paragraphs 1 through 261 with the same force and effect as if set forth at length herein

263.    An actual, justiciable controversy exists between Plaintiff Instituto Brasileiro de Certificações e Inspeções, Ltda. and Defendants regarding the interpretation and validity of PS1 certification standards in the context of the application of the PS1 Standard to the Brazilian plywood market.

264.    Defendants have asserted, through litigation, public statements, and communications to third parties, that I.B.C.I.'s certification of Brazilian plywood products does not meet the requirements of PS1-22 and is therefore misleading or invalid. These statements have

caused direct injury to I.B.C.I. and have disrupted the PS1 certification services it offers to its clients, as well as its clients' access to the U.S. market through a PS1 certification issued by I.B.C.I.

265.    I.B.C.I. contends that its PS1 certification process is fully compliant with all applicable standards, including the PS1 Standard, ISO/IEC 17020, 17025, and 17065, and is recognized by INMETRO, Brazil's national accreditation body. I.B.C.I. further assert that the Coalition's claims to the contrary are false, unlawful, and without a factual or legal basis.

266.    This controversy has immediate and significant practical consequences for I.B.C.I., M7, and the other Brazilian mills I.B.C.I. currently certifiers, as well as Brazilian plywood importers and distributors, and end-users in the U.S. market, who wish to rely on accurate certification to ensure the implementation of safe, code-compliant building materials.

267.    A declaratory judgment is necessary to resolve the ongoing uncertainty caused by Defendants' unlawful conduct and to protect I.B.C.I.'s rights to operate as an accredited certifier in the U.S. plywood market.

268.    Accordingly, pursuant to 28 U.S.C. §§ 2201-2202, I.B.C.I. seeks a declaratory judgment that:

  a. I.B.C.I. is a properly accredited PS1 certification body, fully compliant with the applicable technical and procedural requirements of PS1-22 and all other relevant standards;

  b. Defendants' statements to the contrary are false, misleading, and unlawful under the Lanham Act, the Sherman Act, and other applicable laws;

  c. Defendants have no lawful basis to challenge or interfere with I.B.C.I.'s certifications of Brazilian plywood under PS1-22.

## **JURY DEMAND**

The Plaintiffs demand trial by jury of all issues and claims.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

(A)    On Counts I, II, III, IV, and V, an award of damages in an amount to be determined at trial, including treble damages where authorized by law, and the reimbursement of reasonable attorneys' fees and litigation expenses as provided by law;

(B)    On the Declaratory Judgment cause of action (Count VI), entry of a declaratory judgment declaring that:

      a.    I.B.C.I.'s certification process is fully compliant with PS1's applicable standards, including ISO/IEC 17020, 17025, and 17065 requirements, and all other relevant rules and regulations;

      b.    The Coalition's attempt to impose its own interpretation of PS1 to interfere with I.B.C.I.'s certification or I.B.C.I.'s clients' products is unlawful and unenforceable.

(C)    An award of compensatory damages for all monetary and non-monetary losses suffered by Plaintiffs, including lost revenue, reputational harm, and other consequential damages, in an amount to be determined at trial, plus pre-judgment interest;

(D)    An award of punitive and exemplary damages in an amount to be determined at trial to deter future unlawful conduct by the Defendants;

(E)    An order permanently enjoining Defendants from continuing false and misleading statements, anti-competitive conduct, and consumer harm as described herein;

(F)    An award of Plaintiffs' attorneys' fees and costs incurred in prosecuting this action; and

(G)    Granting such other and further relief as the Court deems just and proper.

Dated: Melville, New York
        May 31, 2025

**KOSAKOFF & CATALDO LLP**

**By:** _/s/ Michael Stanton_
        Michael Stanton
        _Attorneys for Plaintiffs_
        175 Pinelawn Road, Suite 100
        Melville, New York 11747
        631-650-1203 (tel)
        631-650-1207 (fax)
        mstanton@kcllp.net