UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
M7 INDÚSTRIA E COMÉRCIO DE
COMPENSADOS E LAMINADOS LTDA.,
INDUSTRIAL ARBHORES COMPENSADOS
EIRELI, AND INSTITUTO BRASILEIRO
DE CERTIFICAÇÕES E INSPEÇÕES, LTDA.,

                Plaintiffs,                    25-cv-4568 (PKC)


            -against-                       OPINION AND ORDER

U.S. STRUCTURAL PLYWOOD
INTEGRITY COALITION, an unincorporated
association, SCOTCH PLYWOOD CO., INC.,
an Alabama corporation, VENEER
PRODUCTS ACQUISITIONS, LLC, a
Delaware limited liability company d/b/a
SOUTHERN VENEER PRODUCTS,
SOUTHERN VENEER SPECIALTY
PRODUCTS, LLC, a Georgia limited liability
company, HUNT FOREST PRODUCTS LLC,
a Louisiana limited liability company,
FRERES LUMBER CO., INC., an Oregon
corporation; MURPHY COMPANY, an
Oregon corporation; SDS LUMBER LLC, a
Washington limited liability company, and
SWANSON GROUP, INC., an Oregon
corporation,

                Defendants.
------------------------------------------------------------x

CASTEL, Senior District Judge


       Defendants are U.S. plywood producers that have for years engaged in various

efforts to exclude Brazilian plywood from the U.S. market.  Plaintiffs M7 Indústria e Comércio

de Compensados e Laminados Ltda. ("M7") and Industrial Arbhores Compensados EIRELI

("Arbhores") are Brazilian plywood producers.  Plaintiff Instituto Brasileiro de Certificações e Inspeções ("I.B.C.I.") is a Brazilian certifier of plywood to the PS1 standard, which is critical for selling plywood in the United States.  Plaintiffs, collectively the "Brazilian Companies," bring this action alleging that the Coalition's efforts constitute false advertising in violation of the Lanham Act, conspiracy to restrain trade in violation of section 1 of the Sherman Act, tortious interference with contract, and deceptive trade practices in violation of New York General Business Law section 349.  In addition, I.B.C.I. seeks declaratory relief under the Declaratory Judgment Act.  The defendants seek transfer of the action to the Southern District of Florida, or, in the alternative, dismissal for failure to state a claim.

BACKGROUND

The following facts are drawn from the Brazilian Companies' Complaint and are taken as true for the purpose of resolving the instant motions.  Faber v. Metropolitan Life Insurance Co., 648 F.3d 98, 104 (2d Cir. 2011).

In the United States, the PS1 Voluntary Product Standard (the "PS1 Standard") "sets the parameters for the manufacture, sizing, grading, and inspection of structural plywood." (ECF 1 ¶ 3.)  The U.S. Department of Commerce, through the National Institute of Science and Technology, oversees the PS1 Standard, though lacks enforcement authority.  (Id. ¶¶ 35–36.) PS1 is instead "self-regulating[,]" policed only by the PS1 Standing Committee, a group comprised of industry professionals and plywood experts.  (Id. ¶¶ 36, 46.)

To sell PS1-compliant plywood, producers must be certified by a qualified certification body that itself has been accredited by a qualified accreditation body.  (Id. ¶ 3.) Plaintiff I.B.C.I. is a Brazilian certification body accredited by a federal agency of Brazil.  (Id.

- 2 -

¶ 21.)  Plaintiffs M7 and Arbhores are Brazilian plywood producers.  M7 is currently certified to PS1 by I.B.C.I.  (Id. ¶ 19.)  Arbhores has not regained its PS1 certification following the exit from the market of its former certifier, PFS Corp. ("PFS-TECO").  (Id. ¶ 20.)

Defendants are a group of eight American plywood producers.  (Id. ¶¶ 22–30.) They are Scotch Plywood Co., Inc.; Veneer Products Acquisitions, LLC d/b/a Southern Veneer Products; Southern Veneer Specialty Products, LLC; Hunt Forest Products LLC; Freres Lumber Co., Inc.; Murphy Company; SDS Lumber LLC; and Swanson Group, Inc.  (Id.)  "Although nominal competitors," they "have formed and operated for years as" an unincorporated trade association known as the "U.S. Structural Plywood Integrity Coalition."  (Id. ¶ 4.)  The trade association, itself named as a defendant, and the eight American producers are collectively referred to as the "Coalition."  Each producer defendant is currently certified under PS1 by APA – The Engineered Wood Association (the "APA").[1]  (Id. ¶ 42.)

The Brazilian Companies contend that the Coalition has "conspired to suppress competition" by excluding Brazilian plywood from the U.S. market through "coordinated false advertising" and other means.  (Id. ¶ 1.)  While the Coalition's stated objective is to protect the integrity of the PS1 standard, the Brazilian Companies allege that it has ignored "documented PS1 shortcomings" in its "own ranks[.]"  (Id. ¶ 5.)

The Brazilian Companies trace the Coalition's beginnings to a conference where Freres and Southern Veneer and Southern Veneer Specialty (collectively, "Southern") met to discuss their shared concerns over competition from Brazilian plywood producers and agreed to consult an attorney "to 'see what they could do about it.'"  (Id. ¶¶ 56–59.)  According to the Brazilian Companies, Freres began to publicize the theory that Brazilian plywood suffered from

---

[1] The Court understands the acronym the "APA" is premised on a former name of the organization.

quality issues in a blog post claiming the U.S. has been "flooded" with plywood originating from "Loblolly pine, Slash pine, and other North American species" planted in the Amazon rainforest in Brazil.  (Id. ¶ 69.)  This was problematic, the blog suggested, because these "species produce a strong product in [the] North American climate but when grown outside their native environments, they do not produce the same quality or performance of fiber . . . . leading to a compromised construction material."  (Id.)

But the Brazilian Companies maintain that Brazilian plywood does not in fact originate in the Amazon rainforest.  (Id. ¶ 70.)  It is instead made from trees grown in a part of Brazil with the same climate as many of the places where Coalition members have their plywood mills, including "the Florida panhandle, Louisiana, Georgia, and North Carolina[.]"  (Id. ¶ 66.)  The Brazilian Companies further assert that Brazilian plywood had been used in the United States for nearly 30 years "without any issue[.]"  (Id. ¶ 62.)

Freres and Southern soon began collaborating with defendant Scotch, which "held an important seat on APA's industrial sub-committee."  (Id. ¶ 70.)  While the framework governing the accreditation of PS1 certification bodies states that "[i]t is necessary for certification bodies and their personnel to be impartial, and to be perceived as impartial, in order to give confidence in their activities and their outcomes[,]" the APA, unlike other certification bodies, "only offers certification to mills that join its organization, and charges dues based on output, not services rendered."  (Id. ¶ 72.)

The APA's marketing committee, which markets APA members' products, developed the idea of testing the quality of Brazilian plywood.  (Id. ¶ 75.)  In 2017, the APA tested 65 sample panels hand-selected by Coalition members, none of which were made by M7 or Arbhores.  (Id. ¶¶ 77, 81–82.)  The testing examined two attributes of the plywood: (1)

bending strength, or "how much force a panel can bear before breaking[,]" and (2) bending stiffness, or "how much [a panel] flexes under normal use[.]"  (Id. ¶ 85.)  The panels "uniformly passed the strength test, but uniformly failed the stiffness test[,]" though strength and stiffness are typically correlated.  (Id.)  To the Brazilian Companies, this outcome "strongly suggests an illegitimate testing environment or manipulated test results."  (Id.)  Regardless, "the fact that the panels passed all strength requirements suggests potential comfort issues, not a safety risk."  (Id. ¶ 86.)  A former APA quality director explained as follows: "[s]tiffness really gets more to serviceability . . . I can't think of any large negative critical failure mode that can result from low stiffness, unless it was extremely, extremely low."  (Id. ¶ 88.)

The APA subsequently issued a product advisory in 2018 that "call[ed] into question the quality of all Brazilian plywood."  (Id. ¶ 90.)  Closely following the product advisory was Scotch's press release stating: "The United States is being flooded with massive quantities of Brazilian plywood that do not meet U.S. Voluntary Product Standard PS-1 for structural plywood as claimed. The imported product fails to meet stiffness standards and span rating requirements. Importers have not only falsely claimed compliance – some will even be so bold as to stamp 'Made in America' on the boards, meaning South America but leaving out that one vital descriptor to deceive purchasers."  (Id. ¶ 95.)

In one plywood market periodical, a distributor commented that "[s]hipments of Brazilian plywood have increased this year, and the APA producers are losing market share. The message is an attempt to create doubt as to the quality of all Brazilian plywood."  (Id. ¶ 100 (alteration omitted).)  And Freres reported that the advisory "really didn't end up with too much of an effect on the overall marketplace as far as warning people about the potential use of the material."  (Id. ¶ 98.)

After the APA testing, the early Coalition members launched recruiting efforts at industry gatherings and found additional U.S. producers interested in joining should Freres, Southern, and Scotch be able to substantiate the APA test results.  (Id. ¶¶ 107–08.)

Further testing was conducted at Clemson University.  A professor at Clemson with whom the Coalition's counsel had a preexisting relationship "agreed to accept $85,000.00 from the Coalition to build out the machinery necessary to conduct the testing, staff it, and generate an ensuing report."  (Id. ¶¶ 111–12.)  The Coalition's counsel "specified the conditions under which the testing would be performed, making clear that the panels would be selected in the first instance by the Coalition's members[.]"  (Id. ¶ 114.)  The Clemson laboratory was "not accredited," and tested only for stiffness, not strength.   (Id. ¶¶ 111, 126.)  75 percent of the 80 panels tested failed the stiffness test.  (Id. ¶¶ 122, 124.)  The laboratory did not "attempt to provide any scientific confirmation of the results."  (Id. ¶ 126.)

Freres, Southern, and Murphy distributed the Clemson results along with the APA product advisory "as part of [the Coalition's] recruitment campaign."  (Id. ¶ 125.)  Freres also issued a press release claiming that "structural plywood panels produced in South America are being fraudulently certified and stamped as compliant with U.S. Product Standard PS 1-093 for Structural Plywood, when the panels in fact do not meet the country's minimum structural requirements for stiffness and deflection."  (Id. ¶ 129.)  The press release further stated that "Brazilian structural plywood panels have flooded America's domestic market over the last few years due to the strong U.S. dollar, lax environmental standards in the countries of origination, and a concerted effort by the Brazilian government to encourage wanton harvest . . . . A large portion of the volume of panels are manufactured using wood species harvested from large-scale plantations that were once rainforests."  (Id. ¶ 130.)

The Coalition then commenced a lawsuit, U.S. Structural Plywood Integrity Coalition v. PFS Corporation, 19-cv-62225 (S.D. Fla.) ("Plywood I"), against "the two certifiers that then dominated the Brazilian PS1 market," namely PFS-TECO and Timber Products Inspection, Inc. ("TPI"), as well as their accreditor, International Accreditation Service ("IAS"). (Id. ¶ 106.)  The Complaint in Plywood I alleged: "The failure of PFS-TECO and TPI to perform their quality control functions as authorize[d] licensors of the PS 1-09 grade stamp has resulted in millions of square feet of falsely advertised off-grade Brazilian plywood moving into the U.S. and being incorporated into residential and commercial buildings. As a result, U.S. residents who live or work in buildings with off-grade Brazilian plywood are exposed to significant risk of serious injury or death, particularly in the event of a hurricane or significant earthquake."  (Id. ¶ 132 (emphasis omitted).)

After business records of PFS-TECO and TPI became public during Plywood I, the Coalition submitted "vast swaths [of] documentation" to the PS1 Standing Committee and asked it to "issue negative determinations on a range of [PFS-TECO's and TPI's] practices[.]" (Id. ¶ 136.)  The PS1 Standing Committee, however, "declined to strip PFS-TECO and TPI of their credentials, and [] found no issue with their use of (i) testing procedures; (ii) interim approvals; (iii) using subcontractors as inspectors; and (iv) frequency of inspection and testing." (Id. ¶ 137.)

During Plywood I, the Coalition moved for a preliminary injunction.  The request would later be denied, but on June 9, 2020, the Coalition issued a press release "strongly recommend[ing]" that U.S. importers and resellers stop importing Brazilian structural plywood because:

> A decision by Judge Altman to require PFS-TECO and TPI to revoke all 34 of the PS 1-09 certificates those agencies have issued

- 7 -

> to Brazilian plywood mills will mean that a federal judge has concluded that the coalition is likely to win on its claim that Brazilian structural plywood stamped PS 1-09 is a knock-off or counterfeit product that poses a significant health and safety risk to U.S. consumers. **This would expose all importers or resellers who continue to sell Brazilian plywood with PS 1-09 grade stamps to potential liability for false advertising under the Lanham Act. If an injunction is issued, any reasonably prudent importer or reseller of Brazilian plywood should quarantine that product until the PS 1-09 stamps are removed.**

(Id. ¶¶ 151–53 (emphasis in original).)

Freres issued its own press release "strongly recommend[ing] that all U.S. importers and resellers of Brazilian PS 1-09 plywood stop importing structural plywood from Brazil and quarantine whatever they have in inventory in the U.S. for the health and safety of consumers" and referring to Brazilian plywood as "substandard," "unsafe," and "potentially dangerous." (Id. ¶¶ 155–56.)

After their motions to dismiss failed, TPI and IAS settled Plywood I, "agreeing to vacate the Brazilian market and support reforms to the PS1 Standard." (Id. ¶ 139.) PFS-TECO, too, settled after the court denied its motion for summary judgment. (Id. ¶ 140.) It stipulated to a consent judgment, which became effective on May 31, 2022, "that required it to vacate the Brazilian market and not return until a multi-year testing and inspection regimen was undertaken." (Id. ¶¶ 140, 163.)

Another certifier, Benchmark Holdings LLC, d/b/a Benchmark International ("Benchmark"), appeared poised to step in to certify Brazilian plywood. (Id. ¶¶ 145–46.) Benchmark, however, "paused its entry into the Brazilian market in 2021," after the Coalition sent it a "cease and desist" letter "disseminating false information about the quality of Brazilian plywood, mischaracterizing the outcome of the Plywood I settlement with TPI and IAS, and

threatening litigation if Benchmark began certification operations in Brazil on market terms." (Id. ¶¶ 148–49.)

While the federal district court in Plywood I had not made any findings of fact or conclusions of law, the Coalition widely disseminated the PFS-TECO consent judgment, along with the APA product advisory, "claiming that the voluntary settlement . . . was instead a determination by a U.S. District Court that 'forces wholesalers and retailers to immediately consider these products off-grade and to either obliterate the PS 1 stamp on the plywood before resale or destroy it.'"  (Id. ¶¶ 160, 163.)

The Coalition also "misrepresented" the import of the consent judgment to "numerous industry periodicals read by tens of thousands in the building industry[.]"  (Id. ¶ 167.) Ensuing headlines included, for example, "Florida lawsuit bans Brazilian plywood due to poor quality, safety risk[.]"  (Id.)  Almost all the articles "contain[ed] contact information for the Coalition's attorney or one of its members, or both."  (Id. ¶ 169.)

On June 15, 2022, the head of the Board and Code Administration Division for Miami-Dade County in Florida distributed a memo advising that "[b]uilding officials and inspectors should be made aware of these inferior Brazilian Plywood products bearing the PS-1 stamps and not accept these stamps as a means of indicating code compliance."  (Id. ¶ 166.)

Three weeks after the entry of the consent judgment in Plywood I, the Coalition sued Forestwood Industries, Inc. ("Forestwood"), which the American Association for Laboratory Accreditation ("A2LA") had recently approved to serve as a PS1 certifier, as well as A2LA itself, commencing U.S. Structural Plywood Integrity Coalition v. Forestwood Industries, Inc., 22-cv-60976 (S.D. Fla.) ("Plywood II").  (Id. ¶¶ 178, 180, 182.)  At the time, M7 "was in

the process of obtaining PS1 certification through Forestwood" and Arbhores "was in the process of evaluating the existing market[.]"  (Id. ¶ 181.)

"Facing heavy pressure from the Coalition, A2LA temporarily suspended Forestwood's accreditation[.]"  (Id. ¶ 188.)  After Forestwood withdrew from the PS1 market, it was dismissed from Plywood II with prejudice.  (Id. ¶ 191.)  At the time the parties to the instant action submitted their papers, Plywood II was heading to trial, though A2LA had already "represented in judicial filings that it . . . left the PS1 accreditation market for good."  (Id. ¶ 212.) The Court takes judicial notice of the fact that since then, A2LA settled and the case did not go to trial.

Press releases "widely disparaging Forestwood and Brazilian plywood in general" emerged, which "often included direct contact information for the Coalition members or their counsel[.]"  (Id. ¶¶ 191–93.)  A "representative example[]" of these press releases was titled "Brazilian Plywood Manufacturers Circumvent Permanent Injunction with Unqualified Certification Body, Forestwood Industries[.]"  (Id. ¶ 192.)  On its website, Freres wrote: "Considering every certifier faced with scrutiny has ended up losing their accreditation or abandoning the Brazilian market, it makes one wonder how long importers will be willing to take the risk of buying these panels. At this point, it should be clear that there is significant risk to these imported [Brazilian] panels and buyers can hardly claim ignorance."  (Id. ¶ 195.)

In December 2022, insurance risk assessment firm Verisk Analytics issued an advisory suggesting that the district court in Plywood I "effectively banned the importation of a significant number of Brazilian plywood products into the U.S. due to severe safety concerns[.]" (Id. ¶ 175.)  The National Roofing Contractors Association advised distributors "holding the substandard [Brazilian] plywood in inventory" to "consider it to be defective" and "destroy the

- 10 -

plywood or remove the PS 1 stamp from every panel before resale" given "a variety of safety and structural-related concerns with its usage." (Id. ¶ 176 (emphasis omitted).) "As recently as 2024, Freres gave an interview where it called all Brazilian plywood, which includes M7 and Arbhores's products, 'bottom feeder.'" (Id. ¶ 156.)

Following the Coalition's actions, Brazilian producers have had difficulty securing PS1 certification. After Forestwood left the certification market, M7 and other Brazilian mills searched for replacements, but "found no takers." (Id. ¶ 205.) One certifier "concluded 'due to lawsuits and history'" that it would pass. (Id. ¶ 206.) Benchmark is "now the only U.S.-based certification body willing to accept any Brazilian PS1 clients[,]" though it has accepted only a "small subset of Brazilian clients . . . under commercially onerous terms." (Id. ¶¶ 208, 211.) Only I.B.C.I. is "willing to enter the Brazilian market on standard terms." (Id. ¶ 213.) Since M7 lost its certifier, PFS-TECO, because of the settlement in Plywood I, it has only resumed plywood production on a "limited basis" thanks to I.B.C.I. (Id. ¶ 19.) Arbhores is not currently PS1 certified. (Id. ¶ 20.)

Further, the U.S. market for Brazilian structural plywood has declined. Since 2021, Brazilian producers' 15 percent market share has fallen "catastrophically." (Id. ¶ 6.) "Brazilian mills once exported 60 to 120 million square feet of PS1-compliant plywood per month to the U.S." but "that number has collapsed." (Id. ¶ 202). As a result, plywood prices in the U.S. are "generally . . . above market." (Id. ¶ 220.) New York, in particular, "is the largest consumer of Brazilian plywood . . . with 31% of all Brazilian plywood consumed domestically being imported through New York Harbor for consumer use within the State of New York." (Id. ¶ 221.)

DISCUSSION

    I.          Motion to Transfer

Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). Thus, "[d]eciding a § 1404(a) motion to transfer venue 'requires a two-part inquiry: first, whether the action to be transferred might have been brought in the transferee court; and second, whether considering the convenience of the parties and witnesses, and the interest of justice, a transfer is appropriate.'" AGCS Marine Insurance Co. v. Associated Gas & Oil Co., Ltd., 775 F. Supp. 2d 640, 645 (S.D.N.Y. 2011) (Marrero, J.) (quoting Fuji Photo Film Co., Ltd. v. Lexar Media Inc., 415 F. Supp. 2d 370, 373 (S.D.N.Y. 2006) (McMahon, J.)). The burden lies with the movant, and it is "appropriate" to require the movant to demonstrate the desirability of transfer by clear and convincing evidence. New York Marine & General Insurance Co. v. Lafarge North America, Inc., 599 F.3d 102, 113–14 (2d Cir. 2010) (collecting cases).

First, an action "might have been brought" in another forum if venue would have been proper there and the defendant would have been amenable to personal jurisdiction there when the action was initiated. See Hoffman v. Blaski, 363 U.S. 335, 344 (1960).

Courts next consider the following factors: "(1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, [and] (7) the relative means of the parties." D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 106–07 (2d Cir. 2006)

(quoting Albert Fadem Trust v. Duke Energy Corp., 214 F. Supp. 2d 341, 343 (S.D.N.Y. 2002) (Rakoff, J.)) (alteration in D.H. Blair).  Other commonly used factors include "the forum's familiarity with the governing law" and "trial efficiency and the interests of justice."  Everlast World's Boxing Headquarters Corp. v. Ringside, Inc., 928 F. Supp. 2d 735, 743 (S.D.N.Y. 2013) (Engelmayer, J.).  The district court has "broad discretion" in balancing these factors.  D.H. Blair, 462 F.3d at 106.

The Coalition seeks to transfer this action to the Southern District of Florida, chiefly because, at the time it moved for transfer, actions it deems related were currently pending or had concluded recently there.  The Brazilian Companies oppose the motion, having chosen the Southern District of New York because it is where the impact of the Coalition's conduct "has been felt most acutely."  (ECF 29 at 4.)  Because the Coalition has not shown clearly and convincingly that transfer is appropriate, the Court will deny the motion.

A.  The Coalition Did Not Show The Action Could Have Been Brought in Florida

The movant has the burden of demonstrating that personal jurisdiction and venue would be proper in its preferred forum.  Harvé Benard Ltd. v. Nathan Rothschild, K.I.D. International, Inc., 02-cv-4033, 2003 WL 367859, at *5 (S.D.N.Y. Feb. 19, 2003) (Koeltl, J.). The Coalition states that the Southern District of Florida has subject matter jurisdiction over the action as the Brazilian Companies' claims arise under federal law.  It contends personal jurisdiction and venue would also be proper in the Southern District of Florida because its alleged misconduct during Plywood I and Plywood II occurred there.  That conclusory assertion, however, does not suffice to carry the Coalition's burden, as it ignores Florida's long-arm statute, which "is of the type that requires more activities or contacts to sustain service of process than

- 13 -

are currently required by decisions of the Supreme Court of the United States." Starr Indemnity & Liability Co. v. Brightstar Corp., 324 F. Supp. 3d 421, 432 (S.D.N.Y. 2018) (Gorenstein, M.J.) (quoting Bank of Wessington v. Winters Government Securities Corp., 361 So.2d 757, 759 (Fla. 4th Dist. Ct. App. 1978)).

### B.   The Relevant Factors Favor the Brazilian Companies

Even if the Coalition had shown this litigation could properly be conducted in the Southern District of Florida, the balance of the factors relevant to a transfer for the convenience of parties and witnesses favor keeping the action in this district.

#### i.   The Brazilian Companies' Choice of Forum

A plaintiff's choice of forum is usually accorded "great weight." See D.H. Blair, 462 F.3d at 107. Where, however, the plaintiff does not reside in the chosen forum or the forum does not have a meaningful connection to the operative facts of the action, that weight diminishes. E.g., Zepherin v. Greyhound Lines Inc., 415 F. Supp. 2d 409, 411 (S.D.N.Y. 2006) (Marrero, J.). For this reason, the Coalition argues against deferring to the Brazilian Companies' preference for litigating in this forum. It notes that M7 does not allege that it has a "substantial presence" in New York and "does not identify a single New York customer[,]" that Arbhores does not currently have an active PS1 program, and that I.B.C.I. does not do any business in the United States. (ECF 43 at 5.) The Coalition also takes issue with the Brazilian Companies' citation to a "generic article for the proposition that New York imports high volumes of Brazilian plywood" to demonstrate market impact in New York. (Id.)

- 14 -

The Brazilian Companies respond in several affidavits.  While I.B.C.I. "conducts no commercial operations" in the United States, it alleges economic and reputational harm from the exclusion of its clients from the U.S. PS1 market and asserts that the "market impact was most acute in New York and other northeastern states[.]"  (ECF 28 ¶¶ 4–5.)  Similarly, Arbhores asserts that it suffered reputational harm from the Coalition's conduct and suffered that harm most acutely "in northern markets, including New York[.]"  (ECF 27 ¶ 3.)  M7 "primarily" exported plywood to New York before PFS-TECO halted its certification program.  (ECF 26 ¶ 3.)  Since regaining certification, it has focused its sales efforts "on New York, and, secondarily, Texas."  (Id. ¶ 8.)  Further, "M7's most significant customers maintain operations in the State of New York, within 100 miles of the geographic borders of the Southern District of New York."  (Id. ¶ 9.)

M7 also asserts more generally that "New York has historically consumed more Brazilian PS 1 plywood than any other U.S. state, particularly within the Southern District." (Id.)  "In 2021, the year before the Defendants' conduct began causing Plaintiffs' damages, 327,015 cubic meters of Brazilian plywood were imported through New York Harbor, compared with just 141,666 cubic meters through Miami Harbor."  (ECF 25 ¶ 6.)  Further, "[m]ore Brazilian PS1 plywood has been imported into New York than Florida in every year from 2017 through 2020, and this trend has persisted through the relevant damages period in this case, which begins on June 1, 2022."  (Id. ¶ 7.)

Ultimately, while the Court grants the Brazilian Companies' choice of venue a lesser degree of deference, it will not accord it none.  This factor thus weighs slightly against transfer.

ii.  Witnesses

Courts often hold that the convenience of witnesses is the most important factor in considering a section 1404(a) motion, with the convenience of non-party witnesses weighed more heavily than that of party witnesses.  See, e.g., CYI, Inc. v. Ja-Ru, Inc., 913 F. Supp. 2d 16, 22 (S.D.N.Y. 2012) (Nathan, J.).  The movant "must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover."  Walker v. Jon Renau Collection, Inc., 423 F. Supp. 2d 115, 117 (S.D.N.Y. 2005) (Daniels, J.).

The Coalition states that "the overwhelming majority of witnesses reside thousands of miles from New York[,]" identifying, in particular, Clemson University, the APA, PFS-TECO, TPI, A2LA, Benchmark, and Florida building inspectors who received communications from the Coalition.  (ECF 43 at 6.)  The Brazilian Companies name M7's current and prospective customers, the "most significant" of whom "maintain operations in the State of New York, within 100 miles of the geographic borders of the Southern District of New York[,]" and Forestwood, which is based in Wading River, New York, as possible non-party witnesses for whom New York is convenient.  (ECF 25 ¶ 10; ECF 26 ¶¶ 5, 9.)

"Vague generalizations and failure to clearly specify the key witnesses to be called, along with a statement concerning the nature of their testimony, are an insufficient basis upon which to grant a change of venue under § 1404(a)."  Orb Factory, Ltd. v. Design Science Toys, Ltd., 6 F. Supp. 2d 203, 208–09 (S.D.N.Y. 1998) (Sweet, J.).  Because the information the parties provided is insufficient to weigh the convenience of Florida versus New York with confidence, this factor is neutral.

### iii. Documents and Sources of Proof

The Coalition contends that relevant documents can be found in Florida, Brazil, and at the Coalition members' places of business in the U.S. South and Pacific Northwest. The Brazilian Companies do not identify documents or other sources of proof, aside from potential witnesses, that are in New York or elsewhere. However, "[t]he location of relevant documents and the ease of access to sources of proof is mostly a neutral factor, in light of 'the technological age in which we live, where there is widespread use of, among other things, electronic document production.'" Tlapanco v. Elges, 207 F. Supp. 3d 324, 330–31 (S.D.N.Y. 2016) (Nathan, J.) (quoting Rindfleisch v. Gentiva Health Systems, Inc., 752 F. Supp. 2d 246, 258 (E.D.N.Y. 2010)). On these facts, the Court considers the location of documents and sources of proof factor to be neutral.

### iv. Convenience and Relative Means of the Parties

The members of the Coalition are based in the U.S. South and Pacific Northwest. M7, Arbhores, and I.B.C.I. are based in Brazil. The Brazilian companies prefer to litigate in New York. The Coalition prefers Florida. But its members are based not only in the South but also on the West Coast, suggesting that the difference between litigating in New York and Florida is not significant for its members "given 'the conveniences of modern communication and transportation.'" McGraw-Hill Global Education Holdings, LLC v. Mathrani, 295 F. Supp. 3d 404, 414 (S.D.N.Y. 2017) (Pauley, J.) (quoting Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 174 (2d Cir. 2013)).

The Brazilian Companies also argue that requiring them to incur the expense of engaging local counsel in Florida weighs against transfer. They cite Fisher v. Hopkins, 02-cv-

7077, 2003 WL 102845, at *4 (S.D.N.Y. Jan. 9, 2003) (Haight, J.), for this proposition.  In

Fisher, however, the court found that because the plaintiff's economic circumstances had driven

him into a contingency fee agreement with New York counsel, it was a "legitimate

consideration" in the transfer analysis that being required to hire local counsel in Pennsylvania

would subject him to additional expense.  2003 WL 102845, at *4 n.2.  Here, the Brazilian

Companies do not offer any evidence of financial hardship.  Absent such a showing, this factor is

neutral.  See Michaels v. Drexler, 20-cv-1776, 2020 WL 6825692, at *5 (S.D.N.Y. Nov. 20,

2020) (Abrams, J.).


                    v.   Locus of Operative Facts

        "To determine where the locus of operative facts lies, courts look to 'the site of

events from which the claim arises.'"  Guccione v. Harrah's Marketing Services Corp., 06-cv-

4361, 2009 WL 2337995, at *8 (S.D.N.Y. July 29, 2009) (Leisure, J.) (quoting 800-Flowers, Inc.

v. Intercontinental Florist, Inc., 860 F. Supp. 128, 134 (S.D.N.Y. 1994) (Leisure, J.)).  The

Coalition argues that the bulk of the allegedly wrongful acts occurred during Plywood I and

Plywood II in the Southern District of Florida, making that district the locus of operative facts.

The Brazilian Companies argue that the anticompetitive harm of the Coalition's conduct was felt

most acutely in New York, and thus New York is the locus of operative facts.  Neither argument

is completely persuasive.  Where allegedly false statements are at issue, courts generally look not

to the site of injury, but rather to the location where the statements were generated.  See, e.g.,

Casper Sleep, Inc. v. Nectar Brand LLC, 18-cv-4459, 2019 WL 4727496, at *6 (S.D.N.Y. Sept.

27, 2019) (Gardephe, J.).  And it appears that at least some of the actions the Brazilian

Companies take issue with may not have been planned and executed in Florida, as neither party

specifies from where the numerous press releases, blog posts, and advisories maligning Brazilian plywood were created or disseminated.  The Coalition has not demonstrated that this factor tips in its favor and the Court considers it to be neutral.

### vi.  The Forum's Familiarity with the Governing Law

The parties' dispute is governed by both New York and federal law.  While the District Court for the Southern District of Florida is capable of applying New York law, it is also true that this Court frequently applies New York law and is thus familiar with it.  That the Brazilian Companies bring claims implicating New York law weighs against transfer, although only slightly.  See, e.g., Everlast World's Boxing Headquarters Corp., 928 F. Supp. 2d at 747 (noting forum's familiarity with New York law favors keeping the case, but that this fact "merits little weight").

### vii. Trial Efficiency and the Interests of Justice

The interests of justice "relate[ ] primarily to issues of judicial economy." Dostana Enterprises LLC v. Federal Express Corp., 00-cv-0747, 2000 WL 1170134, at *7 (S.D.N.Y. Aug. 16, 2000) (Sweet, J.).  The Coalition urges that the case should be transferred "so that a notice of related case can be filed and the matter properly assigned" to one of the judges in the Southern District of Florida who presided over Plywood I and Plywood II.  (ECF 9 at 13.) The Coalition relies on Wyndham Associates v. Bintliff, 398 F.2d 614, 619 (2d Cir. 1968), in which the court noted the "strong policy favoring the litigation of related claims in the same tribunal in order that pretrial discovery can be conducted more efficiently, duplicitous litigation" and "inconsistent results" avoided, and "time and expense" saved.  The Coalition's reliance on

Wyndham Associates is, however, misplaced for the simple reason that Plywood I and Plywood II have concluded.

Further, "[a]lthough some courts have transferred a case in the interest of judicial economy when the transferee judge had preexisting knowledge or expertise, this rationale tends to involve complex factual circumstances or legal issues." Ahmed v. T.J. Maxx Corp., 777 F. Supp. 2d 445, 453 (E.D.N.Y. 2011). The Coalition makes no argument that the complexity of the claims in this case warrant transfer to the Southern District of Florida. Cf. Fuji Photo Film Co., 415 F. Supp. 2d at 376 (finding transfer was appropriate, in part because the proposed transferee court had "considerable experience and familiarity with the complex technology involved").

The Coalition claims the Brazilian Companies are forum shopping as they "have no connection to New York." (ECF 43 at 7.) But they have pled the existence of New York customers and New York-centric harm, and "so long as there is some connection between the chosen venue and the facts or issues of the case, plaintiffs' choice of forum will be disturbed only if the other factors weigh strongly in favor of transfer." Adams v. Key Tronic Corp., 94-cv-A0535, 1997 WL 1864, at *3 (S.D.N.Y. Jan. 2, 1997) (Mukasey, J.). The Coalition has not demonstrated that the factors weigh strongly in its favor. Accordingly, the Court will not transfer the action.

II.    Motion to Dismiss for Failure to State a Claim

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court assessing the sufficiency of a complaint must disregard legal labels or

conclusions, which are not entitled to the presumption of the truth.  Iqbal, 556 U.S. at 678.

Instead, the court must examine only the well-pleaded factual allegations, if any, "and then

determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  "Dismissal

under Rule 12(b)(6) is therefore appropriate only if 'it is clear from the face of the complaint,

and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a

matter of law.'"  Michael Grecco Products, Inc. v. RADesign, Inc., 112 F.4th 144, 150 (2d Cir.

2024) (quoting Sewell v. Bernardin, 795 F.3d 337, 339 (2d Cir. 2015)).  In reviewing a Rule

12(b)(6) motion, courts assume all factual allegations in the complaint to be true and draw all

reasonable inferences in favor of the non-moving party.  Peretti v. Authentic Brands Group LLC,

33 F.4th 131, 137 (2d Cir. 2022).

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), "the complaint is

deemed to include any written instrument attached to it as an exhibit or any statements or

documents incorporated in it by reference."  Chambers v. Time Warner, Inc., 282 F.3d 147, 152

(2d Cir. 2002) (quoting International Audiotext Network, Inc. v. American Telephone and

Telegraph Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).  "Even where a document is not

incorporated by reference, the court may nevertheless consider it where the complaint 'relies

heavily upon its terms and effect,' which renders the document 'integral' to the complaint."  Id.

at 153 (quoting International Audiotext, 62 F.3d at 72).

A.  Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act

The Court begins with the second cause of action, violation of Section 1 of the

Sherman Act.  The Brazilian Companies allege the Coalition engaged in a horizontal conspiracy

to suppress competition from Brazilian plywood.  The Coalition claims it was motivated by

safety concerns, and that in any event, it is protected by Noerr-Pennington immunity because its challenged actions were government petitioning.  The Court addresses the latter contention, which concerns an affirmative defense, in a separate portion of the opinion.

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal."  15 U.S.C. § 1.  To state a section 1 claim, a plaintiff must allege: "(1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade."  Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc., 386 F.3d 485, 506 (2d Cir. 2004).

With respect to the first requirement, at the pleading stage, the complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made."  Twombly, 550 U.S. at 556.  The allegations must "raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  Id.  "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice."  Id.  Rather, the defendants' conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  Id. at 557.

With respect to the second requirement, while the text of section 1 prohibits "[e]very" agreement or conspiracy in "restraint of trade," in application, the antitrust laws only proscribe "agreements that unreasonably restrain trade."  NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 133 (1998).  "The rule of reason is the accepted standard for testing whether a practice restrains trade in violation of § 1."  Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 885 (2007).  However, "certain business relationships are per se violations of the [Sherman] Act without regard to a consideration of their reasonableness."  United States v. Topco

Associates, Inc., 405 U.S. 596, 607 (1972).  "A small group of restraints are unreasonable per se

because they always or almost always tend to restrict competition and decrease output."  Ohio v.

American Express Co., 585 U.S. 529, 540 (2018) (internal quotation marks omitted).  With such

restraints, the plaintiff "need only plead facts describing the challenged conduct and the relevant

market affected by the conduct."  Mooney v. AXA Advisors, L.L.C., 19 F. Supp. 3d 486, 498

(S.D.N.Y. 2014) (Baylson, J.).

Agreements within the scope of section 1 may be "horizontal," meaning "between

competitors at the same level of the market structure," or "vertical," meaning between

"combinations of persons at different levels of the market structure, e.g., manufacturers and

distributors[.]"  Topco Associates, 405 U.S. at 608.  "Typically only 'horizontal' restraints . . .

qualify as unreasonable per se."  American Express, 585 U.S. at 540–41 (2019).  Vertical

restraints are generally subject to the rule of reason.  See id.

### i.    Horizontal Agreement

"To survive dismissal, 'the plaintiff need not show that its allegations suggesting

an agreement are more likely than not true or that they rule out the possibility of independent

action, as would be required at later litigation stages[.]'"  Gelboim v. Bank of America Corp.,

823 F.3d 759, 781 (2d Cir. 2016) (quoting Anderson News, L.L.C. v. American Media, Inc., 680

F.3d 162, 184 (2d Cir. 2012)).  A plaintiff may allege direct evidence of an agreement but is not

required to do so.  Mayor & City Council of Baltimore, Maryland v. Citigroup, Inc., 709 F.3d

129, 136 (2d Cir. 2013).  An agreement may be plausibly inferred from allegations of parallel or

interdependent conduct "accompanied by circumstantial evidence and plus factors."  Todd v.

Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001).  "These 'plus factors' may include: a common

motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." Mayor & City Council of Baltimore, 709 F.3d at 136 (quoting Twombly v. Bell Atlantic Corp., 425 F.3d 99, 114 (2d Cir. 2005), rev'd on other grounds, 550 U.S. 544 (2007)).

The Complaint alleges facts from which the existence of an agreement between the Coalition members may be plausibly inferred. In 2015 and 2016, Freres and Southern were facing "business headwinds" as domestic plywood lost market share to Brazilian plywood. (Id. ¶¶ 56, 58.) They met at a conference to discuss these headwinds, and Southern agreed to consult an attorney "to 'see what they could do about it.'" (Id. ¶ 59.) Scotch soon joined Freres and Southern in developing a plan to disparage Brazilian plywood. (Id. ¶ 70.) Freres, Scotch, and Southern, now "nascent Coalition members[,]" engaged their own certification body, the APA, to conduct testing of Brazilian plywood. (Id. ¶¶ 71, 75.) The Coalition also organized testing at Clemson University that was directed, at least in part, by the Coalition members' shared counsel and Southern. (Id. ¶¶ 111–17.) The results of these tests, which disfavored Brazilian plywood, were disseminated by Coalition members. (Id. ¶¶ 94, 130.) The early Coalition members also "started a recruitment effort" at industry meetings, as they "needed additional support from domestic mills to increase the value of their claims and leverage these certification and accreditation bodies into untenable and potentially extinction-level litigation conditions." (Id. ¶ 107.)

Members of the Coalition also prosecuted Plywood I and Plywood II against accreditors and certifiers of Brazilian plywood, and used documentation obtained through that litigation to petition the PS1 Standing Committee to censure some of the defendants in those

cases.  (Id. ¶ 136.)  Press releases by the Coalition continued to roll out, describing developments in the litigation, and as detailed below, attempting to parlay the PFS-TECO consent judgment into action by parties outside the litigation.  (Id. ¶¶ 151–54, 163.)

In sum, the Brazilian Companies have plausibly pled that members of the Coalition undertook a multi-faceted campaign against Brazilian plywood, which posed competition.  This alleged arrangement is horizontal rather than vertical, as the members of the Coalition are competing plywood producers.  (Id. ¶ 4.)

## ii.  Restraint on Trade

The Brazilian Companies characterize the Coalition's actions as a per se illegal group boycott.  Not all boycotts, however, are entitled to per se analysis, as "precedent limits the per se rule in the boycott context to cases involving horizontal agreements among direct competitors."  NYNEX, 525 U.S. at 135.  The Supreme Court has also identified several additional factors present in cases in which it has applied the per se approach that involved "joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle."  Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 294 (1985) (internal quotation marks omitted).  These factors are that (1) the boycott "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete," (2) "the boycotting firms possessed a dominant position in the relevant market[,]" and (3) "the practices [of the participants] were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive."  Id.  The Northwest Wholesale Court further explained that while "a concerted refusal to deal need not necessarily

possess all of these traits to merit per se treatment, not every cooperative activity involving a restraint or exclusion will share with the per se forbidden boycotts the likelihood of predominantly anticompetitive consequences." Id. at 295.

The Brazilian Companies have pled a "horizontal agreement[] among direct competitors[,]" as explained above, clearing the preliminary hurdle to per se treatment described in NYNEX, 525 U.S. at 135. As for the first factor described in Northwest Wholesale, the Brazilian Companies allege that they have been denied access to the U.S. market for structural plywood by the Coalition's actions. The Coalition launched Plywood I, which culminated in part in PS1 certifier PFS-TECO being forced to withdraw from Brazil. This "directly compromise[ed] M7 and Arbhores's ability to sell their PS1 products in the U.S." (ECF 1 ¶ 8.) M7 found a new certifier in I.B.C.I. two years later, though its plywood production has resumed only on a limited basis. (Id. ¶¶ 17, 19.) Arbhores remains uncertified to PS1. (Id. ¶ 20.)

Turning to the second factor, the Complaint does not allege that the Coalition possesses a dominant position in the U.S. plywood market. In fact, the Complaint states that the "primary players" in the market are "Georgia Pacific, Weyerhaeuser, Boise Cascade, or Roseburg[,]" none of whom is a part of the Coalition. (Id. ¶ 107.) Coalition members that joined after Freres, Southern, and Scotch instead appear to be described as "established mills on a secondary tier." (Id. ¶ 108.)

As for the final Northwest Wholesale factor, the Complaint acknowledges that the Coalition expressed concerns with the quality of Brazilian plywood and the safety of its use. The Brazilian Companies, however, allege that the testing supporting those claims was flawed. (Id. ¶¶ 74–89, 111–24.) They also allege that the Coalition's concerns with upholding the PS1 standard are pretextual, offering as evidence the tolerance within the Coalition's own ranks of

PS1 violations by members.  (Id. ¶¶ 197–200.)  This is adequate at the pleading stage for the Brazilian Companies to prevail on this factor.  See PharmacyChecker.com, LLC v. National Association of Boards of Pharmacy, 530 F. Supp. 3d 301, 345 (S.D.N.Y. 2021) (Karas, J.) (concluding, on a motion to dismiss, that plaintiff satisfied this factor by claiming defendant's purported safety rationale was "pretextual").

The Court is not convinced by the Coalition's contention that the Brazilian Companies fail to allege a boycott because they do not claim that "the Coalition agreed to withhold business" from them, denied them a needed "essential facility or input[,]" or "conditioned willingness to deal with any party on a concomitant refusal to deal with plaintiffs." (ECF 44 at 11.)  The Supreme Court's decision in Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656 (1961), is enlightening.  In that case, Radiant Burners accused the American Gas Association, Inc. ("AGA") and ten of its members of conspiring to exclude it from the gas burner market.  364 U.S. at 657.  AGA, allegedly influenced by its members, "some of whom [were] in competition with" Radiant Burners, baselessly denied Radiant Burners its "seal of approval."  Id. at 658.  The members, in turn, refused to provide gas for use in Radiant Burner's product on the basis that it had not been approved by AGA.  Id.  The Supreme Court found this alleged conduct "interferes with the natural flow of interstate commerce (and) clearly has, by its nature and character, a monopolistic tendency."  Id. at 660 (internal quotation marks omitted).  Accordingly, it overturned the lower court holding that there had been no violation of section 1 of the Sherman Act.  Id.

The Brazilian Companies do not allege that the Coalition has direct influence over PS1 certification as the members of AGA did over its "seal of approval."  Nor does the Coalition provide some commodity or component that the Brazilian Companies' product requires.  But the

exclusion of Brazilian plywood from the U.S. market on the allegedly pretextual ground that it does not meet a voluntary product standard, as determined by testing in which the Coalition was involved, certainly shares important features with the group boycott alleged in Radiant Burners.

For the foregoing reasons, the Coalition's motion to dismiss the Sherman Act claim will be denied, as the Brazilian Companies have adequately pled a per se violation of section 1.

### B.  Direct False Advertising Under the Lanham Act

The Brazilian Companies' first cause of action, direct false advertising under the Lanham Act, is predicated on a panoply of allegedly false statements by the Coalition.  Under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), any person who "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities" is civilly liable to "any person who believes that he or she is or is likely to be damaged by such act."

To prevail on a false advertising claim, the plaintiff must establish that the message at issue is "(1) either literally or impliedly false, (2) material, (3) placed in interstate commerce, and (4) the cause of actual or likely injury to the plaintiff."[2]  Souza v. Exotic Island Enterprises, Inc., 68 F.4th 99, 118 (2d Cir. 2023) (quoting Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH, 843 F.3d 48, 65 (2d Cir. 2016)).

---

[2] The Coalition argues Rule 9(b) governs the sufficiency of the Brazilian Companies' pleadings alleging false statements.  The Court disagrees.  See Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc., 516 F. Supp. 2d 270, 283 n.2 (S.D.N.Y. 2007) (stating Lanham Act false advertising claims are not subject to the heightened pleading requirements of Rule 9(b)); Precision Imaging of New York, P.C. v. Allstate Insurance Co., 263 F. Supp. 3d 471, 476 n.4 (S.D.N.Y. 2017) (Rakoff, J.) (same for N.Y. Gen. Bus. Law § 349 claims).

The Complaint highlights many statements, press releases, blog posts, and advisories that contain purported misrepresentations. It fails to specify, however, which statements give rise to liability under the Lanham Act. Some statements are described too vaguely to state a claim. (See, e.g., ECF 1 ¶¶ 190–93 (describing "false" press releases but only providing the titles).) Other communications, the Brazilian Companies seem to suggest, did not cause any injury. (See id. ¶ 165 ("Only by misleadingly linking the [PFS-TECO] consent injunction to the APA Product Advisory and attempting to claim a U.S. District Court had made adjudications of fact and determinations of law" was the Coalition "finally able to succeed on its yearslong attempt to affect the market.").) Setting aside statements that are not adequately described or that did not impact the plywood market, one communication remains, namely the press release immediately following the entry of the PFS-TECO consent judgment.

The Brazilian Companies allege that at the "exact time" PFS-TECO's consent judgment went into effect on May 31, 2022, the Coalition disseminated it widely, along with the APA product advisory, claiming that it was "a determination by a U.S. District Court that 'forces wholesalers and retailers to immediately consider these products off-grade and to either obliterate the PS 1 stamp on the plywood before resale or destroy it.'" (Id. ¶ 163.) The Brazilian Companies maintain this statement was "knowingly false" as the consent judgment "contained no such requirement, and no court ever found any defect in the plywood." (Id. ¶ 164.) The full sentence, and the sentence immediately preceding it, read:

> In a Ft. Lauderdale federal court on May 24, Judge Roy Altman entered a permanent injunction requiring the revocation of all PS 1 certificates issued by PFS-TECO to over a dozen Brazilian mills producing structural plywood for the U.S. market. The decision forces wholesalers and retailers to immediately consider these

products off-grade and to either obliterate the PS 1 stamp on the plywood before resale or destroy it.[3]

(ECF 12, Ex. OO.)  The Coalition challenges only the Brazilian Companies' showings on falsity and injury.

i.  <u>Falsity</u>

Falsity may be established through one of two means.  First, a plaintiff may show that the challenged statement is literally false because it either (1) "makes an express statement that is false or" (2) "is 'false by necessary implication,' meaning that the advertisement's 'words or images, considered in context, necessarily and unambiguously imply a false message.'" <u>Church & Dwight Co.</u>, 843 F.3d at 65 (quoting <u>Time Warner Cable, Inc. v. DIRECTV, Inc.</u>, 497 F.3d 144, 158 (2d Cir. 2007)).  "A message can only be literally false if it is unambiguous." <u>Id.</u> Second, a plaintiff may show that the statement is impliedly false if it "leaves 'an impression on the listener or viewer that conflicts with reality.'" <u>Id.</u> (quoting <u>Time Warner Cable</u>, 497 F.3d at 153).  Implied falsity "is usually demonstrated through extrinsic evidence of consumer confusion or through evidence of the defendant's deliberate deception, which creates a rebuttable presumption of consumer confusion." <u>International Code Council, Inc. v. UpCodes Inc.</u>, 43 F.4th 46, 57 (2d Cir. 2022) (internal quotation marks omitted) (quoting <u>Church & Dwight Co.</u>, 843 F.3d at 67 n.8).

The Coalition argues that "the Complaint fails to articulate facts that betray the alleged falsity of any statement made."  (ECF 11 at 27.)  The Court finds that while the press release about the consent judgment is not false on its face, the pleadings permit the inference that

---

[3] The Court has reviewed the full press release, (ECF 12, Ex. OO), provided by the Coalition and not attached to the Brazilian Companies' pleadings, after concluding the Complaint "relies heavily upon its terms and effect," making it "integral" to the Complaint. <u>See</u> <u>Chambers</u>, 282 F.3d at 153.

it is impliedly false.  The press release is not literally false because the statement that the judgment "forces wholesalers and retailers to immediately consider these products off-grade and to either obliterate the PS 1 stamp on the plywood before resale or destroy it" is "susceptible to more than one reasonable interpretation[.]"  See Time Warner Cable, 497 F.3d at 158.  It could be read to mean that the consent judgment applies not just to PFS-TECO, but to all sellers of Brazilian plywood, who are accordingly required by a federal court to destroy the PS1 stamp or the plywood itself.  Alternatively, it could be read to suggest that sellers of Brazilian plywood reconsider their use of Brazilian plywood.

Proceeding with implied falsity, the Court acknowledges that "[i]t is not for the judge to determine, based solely upon his or her own intuitive reaction, whether the advertisement is deceptive."  Johnson & Johnson * Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp., 960 F.2d 294, 297 (2d Cir. 1992).  The Court does conclude, however, that the Brazilian companies have made sufficient factual allegations to find at this stage that the press release is likely to leave "an impression on the listener or viewer that conflicts with reality," Church & Dwight Co., 843 F.3d at 65 (quoting Time Warner Cable, 497 F.3d at 153), because it states that the consent judgment "forces" market participants to regard Brazilian plywood as deficient and to act accordingly when, in reality, "[t]he injunction contained no such requirement [that wholesalers or retailers act], and no court ever found any defect in the plywood," (ECF 1 ¶ 164).

ii.  Injury

Under Lexmark International, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014), a plaintiff must show (1) that his or her injury "fall[s] within the 'zone of interests'

protected by the Lanham Act, and (2) proximate causation."[4]  Souza, 68 F.4th at 118 (quoting Lexmark, 572 U.S. at 129).  Injury in this context requires showing damage to a "commercial interest in reputation or sales."  Lexmark, 572 U.S. at 131–32.  Proximate causation is met when the injury is shown to "flow[] directly from the deception wrought by the defendant's advertising[.]"  Id. at 133.

The Brazilian Companies contend that the Coalition's statements "directly impacted" (1) "Arbhores and M7's ability to secure certification to PS1," (2) "M7 and Arbhores's ability to produce PS1 plywood[,]" (3) "I.B.C.I.'s ability to secure accreditation to PS1," and (4) the "relationship [of all three] with their clients and the broader consumer public." (ECF 1 ¶¶ 226–27.)

The Coalition responds that the Brazilian Companies fail to "plausibly allege a causal link between actionable conduct and their alleged injury."  (ECF 44 at 12.)  The Coalition further argues that it makes little sense to conclude that the decline in the market for Brazilian plywood in the U.S. injured the Brazilian companies, as M7 and Arbhores had already lost their PS1 certifications by that point.  (Id. at 13.)  Finally, the Coalition argues that any injury flowing from M7 and Arbhores's de-certification should be attributed not to it, but to PFS-TECO and TPI, the parties that actually revoked the certifications.  (Id.)

The Court concludes that the Brazilian Companies have plausibly alleged reputational harm, but not injury to sales.  The Coalition widely disseminated the press release on the consent judgment in May 2022.  (Id. ¶ 163.)  The claims in the press release were soon echoed by various market participants.  On June 15, 2022, the head of the Board and Code Administration Division for Miami-Dade County in Florida distributed a memo describing

---

[4] Lexmark, 572 U.S. at 127–28, clarified that these inquiries go to whether the plaintiff "has a cause of action under the statute[,]" not to whether the plaintiff has prudential standing.  The Court accordingly addresses them here.

Brazilian plywood as "inferior" and warning that PS1 stamps on Brazilian plywood should not be trusted. (Id. ¶ 166.)  The Coalition also allegedly contacted industry periodicals and repeated the claims it made in the press release, with ensuing headlines stating, for example, "Florida lawsuit bans Brazilian plywood due to poor quality, safety risk[.]" (Id. ¶ 167.)  In May, June, and July of 2022, Brazilian plywood exports fell 38 percent, 27 percent, and 62 percent year-on-year, respectively. (Id. ¶ 194.)  This sequence of well-pleaded allegations permits the inference that the press release caused reputational harm to the Brazilian Companies.

The Complaint does not, however, adequately allege a link between the press release and a decline in sales.  Though I.B.C.I. reported difficulty securing accreditation, (ECF 1 ¶ 226), it is now accredited by INMETRO, "an administrative wing of the Brazilian government[,]" (id. ¶ 213).  And it alleges no lost business opportunities or sales stemming from the difficulty it had getting accredited before INMETRO stepped in.  Similarly, M7 and Arbhores claim the Coalition has made it more difficult to become certified to PS1 and to produce PS1 plywood. (Id. ¶¶ 204–208, 226.)  But the Complaint does not connect the press release to M7 and Arbhores's de-certification, nor can it, as they had already been decertified by the time it was issued.  Accordingly, the Brazilian Companies have stated a claim for direct false advertising only insofar as they allege reputational harm.

C.  Contributory False Advertising Under the Lanham Act

The Brazilian Companies claim as their third cause of action that "[e]ach Defendant, even if not the direct speaker or disseminator of every false statement, knowingly and materially contributed to the broadcasting and amplification of false and misleading statements made by other Coalition members, their representatives, and their shared legal counsel." (Id.

¶ 246.)  The Second Circuit appears to have recognized contributory claims for false advertising under the Lanham Act "based on the theory that one who intentionally induces another to infringe a trademark [or engage in false advertising] is contributorily liable for this infringement."  See Societe Des Hotels Meridien v. LaSalle Hotel Operating Partnership, L.P., 380 F.3d 126 (2d Cir. 2004).  This theory necessarily requires demonstrating that another party engaged in false advertising.  Here, however, because the Brazilian Companies have only stated a false advertising claim based on a press release that was made collectively by the Coalition, there is no basis for a contributory claim.

### D.  Deceptive Trade Practices Under N.Y. Gen. Bus. Law § 349

In addition to the two Lanham Act claims, the Brazilian Companies' fifth cause of action brings a claim for deceptive trade practices under New York General Business Law section 349, alleging the Coalition "engaged in false and materially misleading advertising and statements regarding the quality, safety, and PS1 compliance of Plaintiffs' products, as well as Brazilian plywood generally," which has impacted New York consumers.  (ECF 1 ¶¶ 256, 259.)

Section 349 proscribes "[u]nfair, deceptive, or abusive acts or practices in the conduct of any business, trade or commerce[.]"  N.Y. Gen. Bus. Law § 349.  To state a claim under section 349, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015) (quoting Koch v. Acker, Merrall & Condit Co., 18 N.Y.3d 940, 941 (2012)).  While the elements for alleging deceptive trade practices under section 349 are otherwise similar to Lanham Act claims, section 349 additionally requires "demonstrat[ing] that the acts or practices have a

- 34 -

broader impact on consumers at large."  Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 25 (1995).

As with the Lanham Act false advertising claims, the Brazilian Companies target the Coalition's allegedly "false and materially misleading advertising and statements."  (ECF 1 ¶ 256.)  And, as with the Lanham Act claims, after stripping away the statements for which the Brazilian Companies failed to adequately plead injury, and those that are not described with sufficient detail, only the press release concerning the PFS-TECO consent judgment remains a viable basis for a claim.  Because the Complaint alleges that the Coalition's acts have impacted "[N]ew York consumers by artificially limiting their choices in the plywood market, driving up prices, and restricting access to quality Brazilian plywood that fully complies with PS1 standards[,]" the Court concludes that the Brazilian Companies have stated a claim under section 349.  (Id. ¶ 259.)  The Coalition's motion to dismiss the section 349 claim is therefore granted to the same extent the Lanham Act false advertising claim is dismissed but is otherwise denied.

### E.  Tortious Interference with Contract

The Brazilian Companies' fourth claim alleges that "M7 and Arbhores had valid and enforceable contracts with non-party PFS-TECO for the certification of their PS 1 plywood" and that M7 later had an agreement with a prospective certifier, Forestwood, all of which the Coalition had actual knowledge of.  (ECF 1 ¶¶ 250–51.)  The Brazilian Companies further allege that the Coalition "commenced sham litigations and engaged in other coercive acts for the sole and specific purpose of interfering with valid and enforceable contracts between Plaintiffs and their certifiers."  (Id. ¶ 252.)

"Under New York law, the elements of tortious interference with contract are (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom."[5] Kirch v. Liberty Media Corp., 449 F.3d 388, 401 (2d Cir. 2006) (internal quotation marks omitted). Nowhere in the Complaint is it alleged that PFS-TECO and Forestwood "violated the terms of [their] contract[s] with" the Brazilian Companies. See id. at 402. Because the Brazilian Companies failed to allege breach, their claim must fail.

### F. I.B.C.I.'s Request for a Declaratory Judgment

The sixth and final cause of action in the Complaint arises under the Declaratory Judgment Act. I.B.C.I. requests, pursuant to 28 U.S.C. §§ 2201-2202, a declaratory judgment that: (1) "I.B.C.I. is a properly accredited PS1 certification body, fully compliant with the applicable technical and procedural requirements of PS1-22 and all other relevant standards;" (2) "Defendants' statements to the contrary are false, misleading, and unlawful under the Lanham Act, the Sherman Act, and other applicable laws;" and (3) "Defendants have no lawful basis to challenge or interfere with I.B.C.I.'s certifications of Brazilian plywood under PS1-22." (ECF 1 ¶ 268.)

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other

---

[5] "In a diversity case, where the parties have agreed to the application of the forum law—as evidenced by reliance on that law in the parties' briefing, as in this case—their agreement ends the choice-of-law inquiry." Bennett v. Sterling Planet, Inc., 546 F. App'x 30, 33 (2d Cir. 2013). Because the Coalition's motion to dismiss deals with tortious interference under New York law, (see ECF 11 at 28), which the Brazilian Companies do not contest, the Court applies New York law.

legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Supreme Court has explained that "the phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007). While the Act "confers on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants[,]" Peconic Baykeeper, Inc. v. Suffolk County, 600 F.3d 180, 187 (2d Cir. 2010) (internal quotation marks omitted), it does not expand the subject matter jurisdiction of the federal courts, Medtronic, Inc. v. Mirowski Family Ventures, LLC, 571 U.S. 191, 197 (2014).

There are three Article III standing requirements: (1) the plaintiff must have personally suffered an injury-in-fact, i.e., an invasion of a judicially cognizable interest which is concrete and particularized as well as actual or imminent, rather than conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct at issue such that the injury is fairly traceable to the challenged conduct; and (3) the injury must be likely to be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992).

I.B.C.I. urges that an "actual, justiciable" controversy exists between it and the Coalition "regarding the interpretation and validity of PS1 certification standards" because the Coalition's statements "that I.B.C.I.'s certification of Brazilian plywood products does not meet the requirements of PS1-22" have "caused direct injury to I.B.C.I." (ECF 1 ¶¶ 263–64.) The Brazilian Companies also argue the Coalition's conduct has "immediate and significant practical consequences for I.B.C.I., M7, and the other Brazilian mills I.B.C.I. currently certifie[]s, as well as Brazilian plywood importers and distributors, and end-users in the U.S. market, who wish to

rely on accurate certification to ensure the implementation of safe, code-compliant building materials." (Id. ¶ 226.)

The Court agrees with the Coalition that I.B.C.I. does not have standing to pursue this claim. The Complaint fails to show an actual or imminent injury redressable through the relief I.B.C.I. seeks. I.B.C.I. effectively requests a pronouncement from the Court that it is properly accredited. But it does not make out a cognizable injury that such a pronouncement would remedy. I.B.C.I. is currently accredited and "[t]here is no allegation that the Coalition has ever challenged or threatened to challenge" its accreditation, nor any "allegation that the Coalition ever sued to threatened to sue" to force it to revoke certifications it has issued to Brazilian clients. (ECF 11 at 29.) Further, the Court has no control over the PS1 accreditation processes. And the Coalition has no power to deprive I.B.C.I. of its accreditation through public statements. Consequently, the Declaratory Judgment Act claim is dismissed.

### III.   Noerr-Pennington Immunity

The Coalition argues that its conduct is completely immune under the Noerr-Pennington doctrine and that accordingly, the Brazilian Companies' claims cannot stand. The Brazilian Companies concede only that the Coalition's settlement with IAS in Plywood I is immune.

Noerr-Pennington immunity shields defendants from "liability for engaging in conduct (including litigation) aimed at influencing decisionmaking by the government." Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 556 (2014). The doctrine is rooted in the First Amendment right to petition the government for redress of grievances. See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 138 (1961). While

the doctrine originated in the antitrust context, it now "extends further and applies to a wide range of civil actions under both state and federal law." In re Elysium Health-Chromadex Litigation, 354 F. Supp. 3d 330, 336 (S.D.N.Y. 2019) (McMahon, J.).  Noerr also extends to petitioning activity "incident to litigation, such as prelitigation 'threat letters,' and settlement offers[.]" PrimeTime 24 Joint Venture v. National Broadcasting, Co., Inc., 219 F.3d 92, 100 (2d Cir. 2000) (citations omitted).  Petitioning activity that is "ostensibly directed toward influencing governmental action" but is in fact "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor" is not, however, protected.  See Noerr, 365 U.S. at 144.

In Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49 (1993), the Supreme Court articulated a two-part test for determining whether purported petitioning activity is in fact a "sham."  First, courts must ask whether the activity is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." Id. at 60.  "If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized[.]" Id.  If the petitioning activity is objectively baseless, however, courts next make the following subjective inquiry: whether the petitioning activity "conceals 'an attempt to interfere directly with the business relationships of a competitor,'" id. at 60–61 (quoting Noerr, 365 U.S. at 144), by using "the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon," id. at 61 (quoting City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 380 (1991)).  Under the objective prong of the test, "[i]t is generally true that a winning lawsuit is 'a reasonable effort at petitioning for redress and therefore not a sham.'" T.F.T.F. Capital Corp. v. Marcus Dairy,

- 39 -

Inc., 312 F.3d 90, 94 (2d Cir. 2002) (quoting Professional Real Estate Investors, 508 U.S. at 60 n.5).

In cases in which the petitioning activity is not limited to a "single action" but is instead "a whole series of legal proceedings," the Second Circuit has held that the test for sham petitioning collapses into the subjective inquiry of "whether the legal challenges 'are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival.'" PrimeTime 24, 219 F.3d at 101 (quoting USS-POSCO Industries v. Contra Costa County Building & Construction Trades Council, AFL-CIO, 31 F.3d 800, 811 (9th Cir. 1994)).

"A court may dismiss a claim on the basis of an affirmative defense only if 'the facts supporting the defense appear on the face of the complaint,' and 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" United States v. Space Hunters, Inc., 429 F.3d 416, 426 (2d Cir. 2005) (quoting McKenna v. Wright, 386 F.3d 432, 436 (2d Cir. 2004)). Because "[t]he *Noerr-Pennington* doctrine functions as an affirmative defense[,]" Muddy Bites, Inc. v. Evergreen USA LLC, 24-cv-07089, 2025 WL 2662959, at *4 n.47 (S.D.N.Y. Sept. 17, 2025) (Kaplan, J.), the Brazilian Companies are "not required to plead, in a complaint, facts sufficient to overcome" it, BPP Illinois, LLC v. Royal Bank of Scotland Group PLC, 603 F. App'x 57, 59 (2d Cir. 2015) (summary order).[6]

For the reasons below, the Court concludes that at this stage in the action, Noerr shields only the Coalition's settlement with IAS.

---

[6] The Coalition suggests in a footnote that "[m]any of the alleged communications are also time-barred." (ECF 11 at 26 n.3.) Because of the conclusory and perfunctory fashion in which this affirmative defense is raised, the Court will not consider it as having been properly raised on this motion. Further, "communications" are not themselves a claim, but rather a part of a claim or evidence in support of a claim.

- 40 -

i.    Plywood I and Plywood II

As an initial matter, the Brazilian Companies ask the Court to apply the sham petitioning test articulated in PrimeTime 24.  But while the Coalition took more than "a single action" now challenged by the Brazilian Companies, its conduct "simply does not rise to the level deemed by the Second Circuit to be automatic petitioning[.]"  See Marchon Eyewear, Inc. v. Tura LP, 98-cv-1932, 2002 WL 31253199, at *8 (E.D.N.Y. Sept. 30, 2002) (citing PrimeTime 24, 219 F.3d at 101) (internal quotation marks omitted).  In PrimeTime 24, the legal challenges at issue were "simultaneous and voluminous[.]"  219 F.3d at 101.  Here, the Coalition filed two legal challenges that were successive, not simultaneous.  The Court therefore applies the test as described in Professional Real Estate Investors, 508 U.S. 49.

The Brazilian Companies suggest that Plywood I and Plywood II were shams. (ECF 1 ¶ 13.)  The Coalition disagrees, urging that it obtained favorable outcomes in each case, precluding a finding that the proceedings were shams.  (ECF 11 at 23–24.)  The Court concludes it is unable to decide the question at this juncture.

In Plywood I, each defendant settled with the Coalition.  Certifier PFS-TECO "stipulated to a consent injunction that required it to vacate the Brazilian market and not return until a multi-year testing and inspection regimen was undertaken."  (ECF 1 ¶ 140.)  IAS and TPI also agreed "to vacate the Brazilian market and support reforms to the PS1 standard."  (Id. ¶ 139.)  These settlements favor the Coalition, whose objective was "to eliminate certification and accreditation bodies from the Brazilian market[.]"  (Id. ¶ 143.)  But while "[i]t is generally true that a winning lawsuit" is not a sham, T.F.T.F. Capital Corp., 312 F.3d at 94, the Brazilian Companies allege that the Coalition submitted "known falsehoods" to the courts that adjudicated

Plywood I and Plywood II, vitiating any right to immunity that may have otherwise existed, (ECF 23 at 23).  The alleged falsehoods include rhetoric in both lawsuits claiming that stiffness failures, as opposed to strength failures, in Brazilian plywood constitute a public safety threat. (Id.)

The Supreme Court has advised that "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process."  California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 513 (1972); see also Litton Systems, Inc. v. American Telephone & Telegraph Co., 700 F.2d 785, 811–12 (2d Cir. 1983) (holding AT & T's conduct "amounted to the sort of abuse of the administrative process that falls within the *Noerr-Pennington* sham exception" in part because of "evidence tending to indicate that AT & T affirmatively misled the FCC").  Because the Brazilian Companies have plausibly alleged that it is untruthful to suggest stiffness issues give rise to safety concerns, the Court will not at this stage hold that the Coalition's prosecution of Plywood I and Plywood II is privileged.

The Court next considers whether the settlement agreements that resulted from Plywood I and Plywood II are protected.  Courts have extended Noerr to activities incident to litigation, such as threats of litigation or offers to settle.  Courts have proven reluctant, however, to apply Noerr to settlement agreements themselves.  See, e.g., In re Nexium (Esomeprazole) Antitrust Litigation, 968 F. Supp. 2d 367, 395 (D. Mass. 2013) ("Courts are largely uniform in their view that private settlement agreements entered into during the pendency of litigation that are neither presented to nor approved by the judge presiding over the dispute fall outside the ambit of *Noerr–Pennington* immunity.").  Nonetheless, some open questions remain about what sort of settlements might pass muster.  The scope of Noerr depends "on the source, context, and nature of the anticompetitive restraint at issue."  Allied Tube & Conduit Corp. v. Indian Head,

Inc., 486 U.S. 492, 499 (1988).  One factor courts have examined in this context is whether the government is a counterparty in the settlement.  See Hise v. Philip Morris Inc., 46 F. Supp. 2d 1201, 1206 (N.D. Okla. 1999), aff'd, 208 F.3d 226 (10th Cir. 2000) (finding settlement protected where "[d]efendants assert that, subsequent to being sued by over 40 states in the respective state courts, they entered into the [settlement, which] . . . . represents the product of defendants' petitioning of the settling states").  Courts have also considered the degree to which the terms of the agreement are tied to the underlying litigation or the relief initially sought.  See, e.g., United Tactical Systems, LLC v. Real Action Paintball, Inc., 14-cv-04050, 2016 WL 524761, *7 (N.D. Cal. Feb. 10, 2016) (finding, at the motion to dismiss stage, that Noerr did not bar plaintiff's Sherman Act claims relating to settlement agreements because "[t]he alleged outcome of the settlement agreements appears to go beyond the foreseeable outcome of" the underlying litigation).

Turning to the settlement agreements that arose from Plywood I and Plywood II, the Court examines only the PFS-TECO consent judgment.  The Brazilian Companies "concede that the IAS settlement, standing alone, likely would have received *Noerr* protections[,]" (ECF 23 at 17 n.8), and the Court does not have before it the full contents of any other agreement, see Payne v. McGettigan's Management Services LLC, 19-cv-1517, 2020 WL 2731996, at *3 (S.D.N.Y. May 26, 2020) (Cote, J.) ("An affirmative defense is grounds for dismissal when it is clear from the face of the complaint and documents integral thereto that plaintiff's claims are barred.").

The Court notes at the outset that in Plywood I, the Coalition brought claims for Lanham Act false advertising and negligence and sought as relief "preliminary and permanent injunctions requiring PFS-TECO and TPI to immediately revoke the certifications of [their]

Brazilian licensees[,]" as well as damages and attorney's fees and costs.[7]  (ECF 12, Ex. A at 42–49.)  The Brazilian Companies contend there can be no Noerr immunity for the ensuing consent judgment because it is "not the mere implementation of claims raised in the lawsuit," but rather a "broader restraint beyond anything the *Plywood I* pleadings or any relief obtainable through it contemplated[.]"  (ECF 23 at 18.)

The consent judgment provides as follows: (1) "PFS TECO is ordered to revoke all of the PS 1 certificates and grade stamps that PFS TECO has issued to plywood mills located in Southern Brazil[,]" (2) "PFS TECO is barred until this permanent injunction is lifted from issuing any PS 1 certificate or grade stamp to any plywood mill in Brazil[,]" (3) "PFS TECO shall not move to lift this permanent injunction until such time as PFS TECO has performed adequate testing" to ensure mills it certifies comply with PS1 and "demonstrate[d] that it has in place a comprehensive system of plywood certification, inspection and testing practices[,]" (4) "PFS TECO is ordered to cooperate with plaintiffs in any litigation raising [similar] issues[,]" and (5) "PFS TECO shall urge the PS1 Standing Committee to create" an oversight committee. (ECF 12, Ex. L.)

These terms sweep beyond what was contemplated in the Plywood I First Amended Complaint.  The Coalition initially sought to force PFS-TECO to revoke its certifications of Brazilian producers.  It achieved more than that: PFS-TECO's complete exit from the Brazilian market for an indefinite period.

In the specific context of Noerr protection of consent judgments, another consideration is the level of involvement of the approving judge.  "[I]t is the agreement of the

---

[7] The Court has considered the Plywood I First Amended Complaint, (ECF 12, Ex. A), and the PFS-TECO consent judgment, (id., Ex. L), after concluding the Brazilian Companies' Complaint "relies heavily upon [their] terms and effect[.]"  See Chambers, 282 F.3d at 153.

parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations embodied in the consent decree." In re Lipitor Antitrust Litigation, 868 F.3d 231, 265 (3d Cir. 2017) (quoting Local Number 93, International Association of Firefighters, AFL-CIO C.L.C. v. City of Cleveland, 478 U.S. 501, 522 (1986)). "Consequently, when parties seek to enforce agreements adopted in consent orders, courts construe terms of the settlement based on the intent of the parties, not of the court." Id. Still, courts evaluating whether Noerr ought to extend to a consent judgment examine the extent of the Court's role. See In re Nexium, 968 F. Supp. 2d at 398 (collecting cases).

And indeed, the Brazilian Companies urge that "[t]he core question is whether the consent injunction 'merely embodied some of the private agreements' between the settling parties." (ECF 23 at 19 (citation omitted).) They further assert that the consent judgment "was merely a private agreement that carried a judicial seal of approval with no party objecting." (Id. at 20.) While Coalition has expressed that Judge Altman "modified" the consent judgment "before signing and entering[,]" (ECF 11 at 11), the Court will not draw an inference against the Brazilian Companies that Judge Altman had a material role in the design of the consent judgment based on a factual assertion in the Coalition's briefing. The Court therefore does not find at this stage in the litigation that the PFS-TECO consent judgment, or any other settlement that resulted from Plywood I and Plywood II apart from the IAS settlement, is subject to Noerr immunity.

ii.  Benchmark Letter

In May 2021, the Coalition sent a "cease and desist" letter to PS1 certifier Benchmark as it was poised to enter the Brazilian market. (ECF 1 ¶ 148.) The letter contained information about Plywood I and a threat to "immediately file suit in federal court [against

- 45 -

Benchmark] in south Florida asserting the same claims made against PFS-TECO and TPI"
should Benchmark "start certifying PS 1 plywood producers in Brazil without the extensive
testing necessary to determine what grades of Brazilian veneer can actually be used to
manufacture PS 1 compliant plywood."[8] (ECF 12, Ex. ZZ at 4.)  The letter also stressed that the
PS1 Standing Committee was in the process of considering reforms to the PS1 standard proposed
by the Coalition, and that "it would be especially inappropriate to recertify any Brazilian
plywood manufacturer before the PS 1 Standing Committee has completed its work[.]"  (Id. at 1–
2, 4.)

   Pre-litigation letters threatening the institution of litigation are generally protected
under Noerr as incidental to the actual institution of litigation.  See Fanatics Collectibles Topco,
Inc. v. Panini S.p.A., 23-cv-6895, 2025 WL 753950, at *7 (S.D.N.Y. Mar. 10, 2025) (Swain, C.J.)
(quoting PrimeTime 24, 219 F.3d at 100).  The Fifth Circuit explains: "Given that petitioning
immunity protects joint litigation, it would be absurd to hold that it does not protect those acts
reasonably and normally attendant upon effective litigation . . . . If litigation is in good faith, a
token of that sincerity is a warning that it will be commenced and a possible effort to
compromise the dispute."  Coastal States Marketing, Inc. v. Hunt, 694 F.2d 1358, 1367 (5th Cir.
1983).

   The Brazilian Companies argue that the letter should not be protected as
preceding a possible lawsuit against Benchmark, as any such litigation would be a sham.  The
Brazilian Companies assert that a suit against Benchmark would be objectively baseless, and
thus a sham, because the Coalition was engaged in "*per se* prohibited policing activity" of the

---

[8] The Court considers the complete contents of the Benchmark letter, (ECF 12, Ex. ZZ), after concluding the Brazilian Companies' Complaint "relies heavily upon its terms and effect[.]"  See Chambers, 282 F.3d at 153. Besides the instances already mentioned, the Court has not relied on the Coalition's declarations at ECF 12 & 13.

PS1 standard.  (ECF 23 at 22.)  The Coalition, on the other hand, maintains that the favorable outcome of Plywood I demonstrates that litigation against Benchmark would not be a sham.  The Court cannot draw inferences about prospective litigation against the Brazilian Companies at this stage.  It therefore will not decide whether the Benchmark letter is embraced by Noerr.  See Fanatics Collectibles, 2025 WL 753950, at *7 (finding plaintiff's allegations that defendant "knew it had no meritorious basis to sue" sufficient to avoid the application of Noerr to pre-litigation threat at the pleading stage).

    iii.  Public Statements

   The Coalition next urges the Court to find immune a wide range of statements it has made publicly about Brazilian plywood and Plywood I and Plywood II.  The Complaint describes a blog post by defendant Freres espousing the theory that Brazilian plywood originates in the Amazon rainforest and is thus of inferior quality, (ECF 1 ¶ 69), other Coalition members' dissemination of misleading test results, (id. ¶ 125), and a press release about the prosecution of Plywood I, (id. ¶¶ 151–53), among other communications.  In the Coalition's telling, these communications were incidental to its petitioning activity in Plywood I and Plywood II and "entirely consistent with the communications that the Fifth Circuit found immunized in *Coastal States Mktg.*"  (ECF 11 at 26.)  But the Coalition fails to explain how the "publicity" that the Fifth Circuit deemed protected was anything other than threats of litigation.  See Coastal States Marketing, 694 F.2d at 1367; see also id. at 1360 & n.6 (finding that notice announcing "Hunt's intention to assert those rights [to the crude oil] wherever and whenever necessary against those who would infringe them" was protected).  The Coalition cites Matsushita Electronics Corp. v. Loral Corp., 974 F. Supp. 345 (S.D.N.Y. 1997) (Jones, J.), which is also distinguishable.  There,

the court found the defendant's communications were "attendant to litigation" and thus protected because they sought settlement discussions with parties against whom the defendant had recently filed suit and information from others to determine whether they would be appropriately joined in that suit.  974 F. Supp. at 359.

Here, the statements at issue "have no relation to the *prosecution* of the [ ] lawsuit[s] as they are merely statements about the status of the parties' litigation" and claimed issues with Brazilian plywood.  See Arista Networks, Inc. v. Cisco Systems Inc., 16-cv-00923, 2018 WL 11230167, at *11 (N.D. Cal. May 21, 2018) (finding this kind of statement unprotected by Noerr).

To the extent the Coalition argues all its statements are protected pre-litigation threats, that argument fails for the reasons given above.  And to the extent its statements were not pre-litigation threats, the Coalition offers no persuasive authority as to why they are owed protection under Noerr.  It is true that "*Noerr* itself involved immunity for a publicity campaign." (ECF 44 at 10.)  "[A] publicity campaign directed at the general public, seeking legislation or executive action, enjoys antitrust immunity[,]" Allied Tube, 486 U.S. at 499.  But the Coalition makes no argument that the press releases, blogs, and other communications at issue were in fact directed at a government entity.  The Court will not draw the inference against the Brazilian Companies that these statements were seeking a government response.  See PharmacyChecker.com, 530 F. Supp. 3d at 339 (finding, for example, an article stating "Urge the Senate to Reject Drug Importation Measures" to be protected, but not articles that did not "appear[] to seek to influence government policy").

iv. Petitioning the PS1 Standing Committee

The Coalition finally argues that Noerr protects its lobbying of the PS1 Standing Committee because that effort constitutes government petitioning.  The Brazilian Companies see things differently, arguing, in reliance on Allied Tube, 486 U.S. 492, that Noerr immunity does not attach because the Coalition's conduct amounted to "lobbying a private standards-setting organization."  (ECF 23 at 26.)

In Allied Tube, the Supreme Court denied Noerr-Pennington immunity to a steel electrical conduit manufacturer that caused the National Fire Protection Association (the "NFPA") to exclude competing plastic electrical conduits from its National Electric Code.  485 U.S. 492.  The NFPA was comprised of "31,500 individual and group members representing industry, labor, academia, insurers, organized medicine, firefighters, and government."  Id. at 495.  The standards it produced were voluntary, though the National Electric Code specifically was "routinely" adopted by "[a] substantial number of state and local governments[.]"  Id.  The Court's holding was based in part on the finding that the NFPA could not be considered a "quasi-legislative" body despite its influence with state and local governments, as it was comprised of "persons unaccountable to the public and without official authority, many of whom ha[d] personal financial interests in restraining competition[.]"  Id. at 501–02.

Here, the Complaint avers that the PS1 standard is "developed" and "overseen and implemented" by the U.S. Department of Commerce and the National Institute of Science and Technology.  (ECF 1 ¶¶ 3, 35.)  They lack enforcement authority, however, and have "delegated" the "interpretation and application" of the standard to the PS1 Standing Committee, which is "comprised of industry professionals and technical experts with experience in plywood manufacturing, inspection, and use."  (Id. ¶ 36.)  The role of the Commerce Department in the

PS1 standard may at a later stage in this litigation compel the conclusion that this action is fully distinguishable from Allied Tube.  But questions currently remain about the degree of government involvement with the PS1 standard.  Deciding the applicability of Noerr to the Coalition's efforts with the Standing Committee therefore requires the resolution of factual issues that the Court cannot reach at this stage.  See Anderson News, 680 F.3d at 185 (2d Cir. 2012).

On the present motion, the Coalition has not demonstrated that it is entitled to Noerr immunity for any claimed petitioning activity besides its settlement with IAS.


CONCLUSION

That portion of defendants' motion that seeks to transfer venue is DENIED.  That portion of defendants' motion that seeks dismissal of the Complaint is GRANTED IN PART as follows: (1) the direct false advertising claim under the Lanham Act (First Claim) and the N.Y. G.B.L. section 349 claim (Fifth Claim) are dismissed to the extent either is premised upon injury based on any conduct other than the press release concerning the PFS-TECO consent judgment and/or seeks to recover for harm other than to the Brazilian Companies' reputations; (2) the contributory false advertising claim under the Lanham Act (Third Claim) is dismissed; (3) the tortious interference with contract claim (Fourth Claim) is dismissed; (4) the Declaratory Judgment Act claim (Sixth Claim) is dismissed; and (5) all remaining claims, insofar as they rely on the Coalition's settlement with IAS, are dismissed.  In all other respects, the motion to dismiss is DENIED.  All other relief is DENIED.  The Clerk is respectfully directed to terminate the motions at ECF 8, 10 & 45.

- 51 -

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:        New York, New York
              March 18, 2026